LOUISA McCALL *et al.*

*v.*

WILLIAM S. Moss *et al.*

| 112 | 493 |
| 129 | 616 |
| 112 | 493 |
| 45a | 478 |
| 112 | 493 |
| 197 | ¹342 |

*Filed at Ottawa September 27, 1884—Rehearing denied March Term, 1885.*

1. PARTNERSHIP—*what will work a dissolution.* Where one partner dies, or sells his interest in the partnership to another, or a new member is admitted by the purchase of a portion of the capital stock owned by one of the members of the firm, either of these events will in law operate as a dissolution of the firm.

2. SAME—*forming a new firm—evidence thereof—as affecting the binding force of the articles of the old firm.* In 1853 a partnership was formed, under the name of M., B. & Co. In 1855 one of the members died, and two of the surviving members bought his interest of his heirs, and the firm was continued until in 1856, when the interest of the deceased member was sold to a new member, the old firm name was retained, and they continued the same business; but new books were opened, in one of which this entry was made: "M., B., M. & F., (the latter being the new partner,) have this day entered into partnership," etc.: *Held,* that such entry indicated that the prior firm had ceased to exist, and that another had been formed which was not governed by the original articles of co-partnership, and that such articles were not binding upon the new firm, except so far as they might be adopted by it in the management of its business.

3. SAME—*modification of the terms of contract of partnership—by acts and transactions of the firm in the course of business.* The members of a partnership may waive, or modify and change, any provision in their original contract of partnership; and a change in that regard may be inferred from a long course of dealing inconsistent with its provisions. Partnership articles, in equity, are liable to be controlled, superseded, qualified or waived by the acts and transactions of the firm in the course of business thereof, whenever the assent of all the partners thereto may be fairly inferred, however positive and stringent their provisions may be.

4. SAME—*changing items of interest charges, as between partners—whether all must assent.* On an accounting in respect to partnership affairs, the evidence showed an understanding among all the members of the firm to charge interest to each on all sums withdrawn by him, and to credit each with interest on all sums advanced by him to the firm, and such charges and entries were made in accordance with that understanding. It was *held,* the interest so charged and credited could not be set back on the books, and thus change the result, except by the consent of each and all of the partners.

5. SAME—*interest charges, as between partners—as to periodical rests, or when an account may be stated for the purpose of computing interest.* Where partnership articles contain no agreement for annual or periodical rests, and there is no agreement or usage for stated settlements of the accounts of the partners, they can only be stated at the close of the partnership, for the reason it can only then be ascertained whether there are profits to be divided or losses to be shared; and until this is done, interest can not be charged or credited to the several members for sums taken out in excess of a partner's share of profits, or for moneys advanced in excess of his indebtedness to the firm.

6. So where a partnership is formed of four persons, no definite amount of capital stock being agreed on, but each partner to furnish one-fourth of the capital, and it is agreed that each shall receive ten per cent interest on whatever sum he may advance, and be charged like interest on moneys drawn out by him, and no periods are fixed for settlements, and no settlements are made during the existence of the firm, it will be proper, in an accounting in respect to the partnership affairs, to charge each partner with the interest on the sums drawn out by him, until the close of the partnership, as his share of the profits can not be known at any time before.

7. SAME—*correcting improper transfer to books of a new firm—whether allowable.* On the books of a firm, known as firm No. 2 and 3, an entry was made of sales to a third person, of $40,000. Three years afterwards the book-keeper transferred this account to the books of firm No. 4, (a succeeding firm,) in which one of the members of firm No. 2 and 3 was not a member. The master refused to hear evidence and correct this entry or charge, and the court refused to send the case back to the master to take proof and correct the books: *Held,* that the court erred in denying the right to prove the facts in relation to this change in the books.

8. SAME—*dealings between partners concerning the interest of one of them—whether the firm may be connected with them—and as to rights of a new firm.* Where one of four partners assumes an indebtedness of another partner to the firm, the partners so dealing together will have no right to credit the debtor partner with the amount of his indebtedness on the books of the firm, unless it is actually paid into the firm, or it is in some way authorized or ratified by the other two partners; nor can such indebtedness be changed and transferred to a new firm not composed of the same members, without the consent or ratification of all the partners.

9. SAME—*as to debt of one partner to the firm assumed by another— remedy of the former.* Where one partner assumes the payment of the indebtedness of another partner, to the firm of which they are members, and the latter, whose indebtedness to the firm is so assumed, actually pays the amount of such debt to the former, in a settlement of their private accounts, and the partner so assuming to pay fails to account to the firm, the remedy of the original debtor partner would seem to be against the estate of the delinquent partner, and not against the firm or other partners.

10. FORMER ADJUDICATION — *in regard to items of account between partners—whether conclusive in subsequent suit.* Where A, one member of a firm, was liable to the firm in a large sum, which by a private arrangement was assumed by B, another partner, and charged to him on the firm books, and on taking an account between the partners the court gave A credit for the amount, with interest thereon, but in the final decree failed to charge the estate of B with the same, on the ground that a former decree had been rendered against the estate for a less sum, which had been paid, the former decree having been reversed, it was *held*, in the case, a cross-bill having been filed by A since the first decree, that the estate of B was not relieved, by the rendition and payment of the former decree, from this charge, but should have been held responsible in the final decree for this item, with interest, and that the final decree was erroneous in this respect.

11. BILL FOR AN ACCOUNT—*its requisites—as to stating items in detail.* The law does not require that each item of the accounts or claims in a bill for an accounting and settlement of partnership affairs shall be specifically set forth in the bill, in order that the court or master may pass upon the same.

12. REFERENCE TO MASTER—*referring case back as to items overlooked.* On bill for the settlement of partnership affairs, and for an account involving a large amount and a multitude of items, with many complications, where an item has been overlooked by the master in chancery and counsel in taking evidence, and the decree has to be reversed on other grounds, making a further reference to the master necessary, it was held proper to allow the parties, on such second reference, to introduce evidence as to such item.

APPEAL from the Appellate Court for the Second District ;— heard in that court on appeal from the Circuit Court of Peoria county; the Hon. JOSEPH W. COCHRAN, Judge, presiding.

Messrs. HOPKINS & HAMMOND, for the appellants :

The death or retirement of one partner from a firm operates as a dissolution of that firm. Parsons on Partnership, 406, sec. 1; Story on Partnership, secs. 272, 307, 321; *Edens* v. *Williams*, 36 Ill. 252.

Partnership contracts may be made by verbal agreement, and written contracts for a partnership may be altered, modified and changed, or provisions in waived; and this may be shown by acts, usages and acquiescence. Parsons on Partnership, 7, 238, 519; Collyer on Partnership, sec. 209; *Geddes* v. *Wallas*, 2 Bligh, 397 ; *Jackson* v. *Sedgwick*, 1 Swanst.

460; *England v. Cushing,* 8 Beav. 129; *McGregor* v. *Pulling,* 1 Freeman's Ch. 357.

Entries in the books are conclusive of the rights of the partners.

The evidence establishes an agreement that an interest account should be kept, and paid between the firms, at ten per cent on net balances.

The decree is erroneous in finding against appellant as to the item of $28,265.25, of Moss' indebtedness assumed by Bradley.

The court erred in refusing to hear proof and correcting mistake in matter of $40,195.37, sales of highwines.

The following authorities show, first, that when articles of co-partnership provide that partnership accounts shall be settled at any fixed periods, courts will compel settlements at the appointed times; second, if the articles contain no provision for periodical settlements, yet if it appears that the partners have adopted or acquiesced in settlements at definite times, the courts will read the articles as if they contained a provision for such periodical settlements; and third, if neither by the partnership articles, nor by usage, any agreement for periodical settlements of partners' accounts exists, then the partnership accounts can only be stated at the end of the firm, for only then can it be known whether there are profits to be divided or losses to be shared. Parsons on Partnership, (2d ed.) 314, 537; Story on Partnership, sec. 349; *Jackson* v. *Sedgwick,* 1 Swanst. 469; *Petty* v. *Janeson,* 6 Madd. 146; Collyer on Partnership, secs. 224, 318; Gow on Partnership, (3d ed.) chap. 5, sec. 4, pp. 353, 354.

Mr. S. D. PUTERBAUGH, for the appellant Perry Frazer:

The court was not justified in disregarding the interest account between the partners, by the unauthorized act of Dunne in setting back the interest on the accounts of the partners.

The account of Bradley in firm No. 2 and 3, does not show that he was ever debited with the $28,265.25 indebtedness of Moss; nor does the individual account of Moss in firm No. 2 and 3 show that the same was ever debited to him. The transfer of that part of Moss' account to Bradley was without authority, and McCall and Frazer can not be made to look to Bradley's estate for this sum.

The dissolution of a partnership is the proper time to make a rest and adjust the balance of the partnership account, and the partner against whom the balance is found is chargeable with the interest thereon. *Stoughton* v. *Lynch,* 2 Johns. Ch. 209; *Hollister* v. *Barkley,* 2 N. H. 501; *Simpson* v. *Filtz,* 1 McCord's Ch. 213; *Goddard* v. *Bullon,* 1 N. & McC. 46; *Robbins* v. *Taswell,* 58 Ill. 203; *King* v. *Hamilton,* 16 id. 190; *Honore* v. *Colesuil,* 7 Dana, 201.

Mr. D. McCulloch, and Mr. John Muckle, for the appellee William S. Moss:

Bradley could not change the terms of the partnership, under the general power of attorney, for Moss, as that would be contracting on behalf of his principal with himself. *Rush* v. *Newell,* 25 Ill. 226; *Ingersoll* v. *Bannister,* 41 id. 388; *Dennis* v. *McCagg,* 32 id. 429; *Van Horn* v. *Tonda,* 5 Johns. Ch. 388; *Sweet* v. *Jacocks,* 6 Paige, 385; *Switzer* v. *Skiles,* 3 Gilm. 529.

The proof does not show any agreement at the time Frazer came into the firm, or at any time thereafter, to change the terms of the co-partnership; nor were the books of firm No. 2 and 3 kept during that time with reference to an interest account between the partners.

Mr. Justice Craig delivered the opinion of the Court:

This was a bill in equity, brought in May, 1868, by James H. McCall and Perry Frazer, in the circuit court of Peoria county, against William S. Moss, and Lydia Bradley Clark,

administratrix of the estate of Tobias S. Bradley, deceased, for the settlement of the partnership accounts of one of the firms of Moss, Bradley & Co., known as firm No. 2 and 3, and composed of William S. Moss, Tobias S. Bradley, James H. McCall and Perry Frazer.

The principal object of the bill, as originally framed, was to recover some $84,000, which was in the main a balance of interest claimed to be due from Moss and Bradley for moneys which they had drawn out of the firm and used in their own business. At the December term, 1870, of the Woodford circuit court, the cause proceeded to a hearing before Judge Richmond, and a decree was rendered in favor of the complainants for $82,408.11, of which Moss was decreed to pay $56,591.12, and the administratrix of the estate of Bradley, $25,816.99. The estate of Bradley made no objection to the decree, but paid the amount adjudged against it. No appeal from the decree was taken by Moss, and three years after the decree had been rendered, suit was brought upon it in California against Moss, judgment rendered, and the amount collected on execution. After the decree had thus been paid, Moss sued out a writ of error from this court, returnable to the September term, 1874, for the purpose of reversing the decree, and the decree was reversed and the cause remanded, mainly on the ground that the record showed a complicated state of accounts, and the cause had not been referred by the circuit court to a master to state an account between the parties. (See *Moss* v. *McCall,* 75 Ill. 190.) After the cause had been remanded, Moss filed a cross-bill, in which he set up the payment of the former decree, its reversal, and asked to be credited with the money collected from him, and that the several parties be required to pay him whatever sum might be found due him upon an account being taken. Additional evidence having been taken, the cause was again heard before the circuit court of Peoria county, when a decree was rendered in which certain facts were found, and the rights

of the parties fixed as to certain matters, and the cause referred to the master to state an account. In this decree the court did not determine whether the members of the firm should be charged with interest on money drawn from the firm, and credited with interest on money advanced; but the court directed the master, in the decree, to report two statements, one with interest on the individual accounts of partners, and one without interest. The master made a report, as required by the decree, and on the final hearing the court refused to adopt, as a foundation for the decree, schedules "A 1," "A 2," "A 3" and "A 4" of the report, which embraced a statement of the accounts, with interest, as shown by the firm books, but adopted as a basis for the decree schedules "B 1," "B 2," "B 3" and "B 4" of the report, rejecting entirely the allowance of interest claimed to be established by the evidence by complainants. Under this view Moss was found to be indebted to the complainants only in the sum of $3307.32 which had been paid by the amount recovered on the former decree, leaving a large amount in complainants' hands to be refunded, which they were required to do by the decree.

In order to determine whether the decree of the circuit court can, under the evidence, be sustained, a brief reference to the facts in the case, and the evidence introduced in support of the facts, seems to be required.

Moss, Bradley & Co. was the name and style of four different firms, which were known as firm No. 1, No. 2 and 3, No. 4, and No. 5. Firm No. 1, which was the first, was composed of Moss, Bradley, Smith and McCall, and it was formed for the purpose of milling and distilling in the city of Peoria, under written articles of co-partnership, which bore date February 25, 1853. Under the contract, each party was to furnish one-fourth of the capital, and they were to share equally in the profits or losses of the business. A distillery was to be erected. McCall had at the time only $3500 to put in the

firm, to be used in building the distillery and furnishing the fixtures, and Moss agreed that after that sum was expended he would furnish McCall what money he needed to pay his full share of the building, etc. Moss was to loan the money to McCall for two years, at ten per cent interest. The contract also provided that "a complete set of books shall be kept, showing all business transactions of the firm, and that the same shall be kept by Tobias S. Bradley, or under his directions." Bradley also had the sole right of drawing all notes, drafts, or other instruments of writing whatsoever, connected with the business, and no other member of the firm had the right to bind the firm in any manner whatever without the assent of all the parties, in writing. In the summer of 1855 one of the partners (Smith) died, and Moss and Bradley bought of the heirs his one-fourth interest in the firm, and the business of the firm was carried on by the surviving partners in the same manner as it was before Smith's death. Firm No. 1 continued until June 2, 1856, when Moss and Bradley sold to Perry Frazer the one-fourth interest they purchased of the heirs of Smith, and during its existence the firm manufactured a large quantity of whisky, and fed large numbers of hogs and cattle, and made large profits in its business. After Perry Frazer purchased one-fourth interest in the firm, it was still known by the name and style of Moss, Bradley & Co., but the firm was designated as firm No. 2 and 3, and composed of Moss, Bradley, McCall and Frazer, each owning one-fourth of the capital. The business was continued by this firm from June 2, 1856, until May 26, 1862, when McCall sold his interest therein to John H. Francis and Charles Raymond, and from that date the business was carried on in the name of Moss, Bradley & Co., but the firm was designated as firm No. 4, composed of Moss, Bradley, Frazer, Francis and Raymond. This firm continued until August 2, 1862, when Moss sold out to Edward N. Jack. From this date the business was carried on in the same name,—Moss,

Bradley & Co.,—but the firm was composed of Bradley, Frazer, Francis, Raymond and Jack, and it was known as firm No. 5. The business was carried on by firm No. 5 from August 2, 1862, until August 1, 1865, when it stopped business, and was dissolved about January 1, 1866, when it was succeeded by a new firm, known as Bradley, Jack & Co., which has no connection with the matters involved, and it will not be necessary to give any attention to that firm.

The manner in which the business of the firms Nos. 1 to 5 was conducted, is peculiar. In every instance, when one firm stopped business and the new one succeeding it commenced, the firm that stopped did not settle up, and divide its capital and assets among its members, but all the capital and assets were, by agreement of all parties in interest, turned over to the succeeding firm, and the new firm assumed the liabilities of the old firm, took its assets, and agreed to repay all that remained after the payment of all liabilities. From firm No. 1 to firm No. 5, inclusive, this is the manner in which the business was transacted, and while the bill was filed to settle the affairs of but one firm, (No. 2 and 3,) the business of the four firms is so connected and interwoven that it will be necessary to look somewhat into the business of all to arrive at a proper mode of adjusting the business of the firm in question.

Written articles of co-partnership were signed upon the formation of firm No. 1, bearing date February 23, 1853, but no other articles of co-partnership were executed during the existence of the four firms, and the firm name, Moss, Bradley & Co., was continued during the entire period that the four firms existed. It has, however, been contended that there never was but one firm,—that the four firms (No. 1, No. 2 and 3, No. 4, and No. 5,) were all doing business under the written contract first made, and that the contract should govern in the settlement of the affairs of the members of the firm as to the payment of interest. We understand the rule

to be, that when one partner dies, or sells his interest to another, or a new member is admitted by purchase of a portion of the capital owned by one or more members of the firm, such will, in law, work a dissolution of the firm. Parsons on Partnership, (page 406, sec. 1,) states the law as follows: "It may now be considered as a settled rule of the law of partnership, in England and in this country, that the retirement of one partner from a firm consisting of any number of persons, operates as a dissolution of that firm. * * * We suppose the truth to be, that if a partner retires, whether by voluntary act, bankruptcy, expulsion or death, or if a new partner comes in by any means whatever, in either of these cases the old partnership ceases to exist." See, also, Collyer on Partnership, sec. 110; Story on Partnership, secs. 307, 308, 272, 321; *Edens* v. *Williams*, 36 Ill. 252; *Marquand* v. *New York Manf. Co.* 17 Johns. 525.

If we are correct in this position, which we think is well sustained by the authorities, it follows that the original firm of Moss, Bradley & Co., which commenced business under the written articles of co-partnership, was dissolved, in law, on the 2d day of June, 1856, when one-fourth interest in the firm was sold to Perry Frazer, and he was admitted as a member of the firm. The second firm, known as No. 2 and 3, was, in law, dissolved on the 26th day of May, 1862, by the sale of a fourth interest in the firm by McCall, to Francis and Raymond, who were then admitted as partners. Firm No. 4 was dissolved in August, 1862, when the interest of Moss in the firm was sold to Jack. There are other things which strengthen this view. When firm No. 2 and 3 commenced business, a new set of books was opened, and on the first page of the journal we find the following entry:

"Peoria, Ill., *Monday, June 2, 1856.*

"William S. Moss, Tobias S. Bradley, James H. McCall and Perry Frazer have this day entered into partnership," etc.

Entries of a similar character were made in the books at the commencement of the firms (Nos. 4 and 5) which followed. This entry in the books when firm No. 2 and 3 began business, does not indicate that there was but one firm, which continued from the first until the last, but, on the other hand, it indicates that the first firm had ceased, and that another had been formed for the transaction of the same business. The fact, therefore, that the original articles of co-partnership did not provide that an interest account should be kept between the members of the firm, does not militate against the right of complainants to have the accounts as to the members of firm No. 2 and 3 stated, with interest, as the written articles of co-partnership entered into to govern firm No. 1 could not be regarded as binding on the succeeding firms, except so far as they were adopted by such firms in the management of the business.

But, independent of this view, conceding that the original articles agreed upon by firm No. 1 were adopted by the succeeding firms, it does not follow that interest was not to be charged on money advanced or drawn out by members of the firm. The members of the firm had the right, if they saw proper, to waive any provision in the original contract of co-partnership, or change the contract, or modify it in any manner they might think proper. A change in the written articles may sometimes be inferred from a long course of dealing between the members of the firm inconsistent with the written articles. Collyer on Partnership, sec. 210, says: "In ordinary partnerships, nothing is more clear than this: that although partners enter into a written agreement, stating the terms on which the joint concern is to be carried on, yet if there be a long course of dealing, or a course of dealing not long, but still so long as to demonstrate that they have all agreed to change the terms of the original written agreement, they may be held to have changed these terms by conduct." Story on Partnership, sec. 192, says: "Partnership articles,

in the view of courts of equity, whatever may be the rule at law, are liable to be controlled, superseded, qualified or waived by the acts and transactions of the partnership, in the course. of the business thereof, whenever the assent of all the partners thereto may be fairly inferred, and however positive or stringent these provisions may be." See, also, Parsons on Partnership, 238; *England* v. *Cushing*, 8 Beav. 129.

We will now refer briefly to some of the evidence bearing upon this question, for the purpose of determining whether, by agreement or otherwise, the original contract of co-partnership was changed, and, first, McCall testified that the understanding and agreement was, that Bradley was to keep an interest account; when a member advanced money to the firm he was to be allowed ten per cent interest, and when he drew out money he was to be charged ten per cent interest on the amount so drawn out, and when final settlement was made, his credit and debit interest was to be charged and credited.

Frazer, who was a member of firms Nos. 2 and 3, 4, and 5, testified substantially as follows: "When I became a member of the firm of Moss, Bradley & Co., there was an agreement or understanding among us about keeping an interest account between the members of the firm. The agreement was, that there was to be an interest account kept, at the rate of ten per cent. If one partner had more in than another, he got more interest. If one of the partners drew money, he had to pay ten per cent interest for it. That agreement continued with all the firms of Moss, Bradley & Co., except firm No. 5, in which case we agreed to set the interest back until the mill stopped. That agreement was not reduced to writing. At the time I became a member I never signed any such agreement. I had no written agreement with any of the firms."

Raymond, who was a member of firms Nos. 4 and 5, testified that there was a distinct understanding that interest should be charged, and heard Bradley instruct the book-keeper

to figure interest for and against the different members of the firm, in posting the books.

John W. Fuller, who was in the employ of Moss, Bradley &. Co. from 1856 to 1864, except four or five months, as general cashier, receiving, weighing and paying for the grain consumed by the house, testified that Bradley was the only member of the firm who had control or charge of the books; that Bradley first undertook to keep the books, but fell behind, and employed Haney, who kept them until Dunne took charge, and he continued in general charge all the time witness was there. Dunne was under Bradley's orders. In 1859 Aylward was employed to balance up the books. This witness also testified: "I heard, when Aylward was there closing up the books, Dunne instructing Aylward to charge interest on every item of the personal accounts of the members of the firm,—of each member of the several firms,—the accounts of which Aylward was figuring at, up to that time. He didn't want to do it, and said it would take him a lifetime to do it, and requested me to ask Mr. Bradley if that was the way it should be done. I did so. Mr. Bradley answered, certainly; that that would be the only just manner that they could settle up their business; that if one man had more money in the firm than the other, he should have interest for it. Mr. Bradley mentioned ten per cent as the amount of interest, and instructed Aylward to figure it at that, and he did so, and made the interest on sheets of paper, taking an item of account, first getting the time of it, and then computing the interest up to the time he was figuring. He put the amount of interest on a sheet of paper,—the debits on one side, and the credits on the other,—so when he got through he could charge the interest up in one entry. I have heard the other members frequently say that that was the way they understood it, and that that was the way the business was to be settled. The conversation of Bradley took place in presence of myself, Aylward, and, I think, Dunne, in the office of Moss,

Bradley & Co.   What the other members said was in the office, both before and after the time I have alluded to.   Have heard it talked and discussed when Bradley was present, but most generally they would talk about it among themselves." The witness also testified that Aylward worked on the books, in computing the interest, fully a year, but died before the books were balanced, and Jack was employed to complete the work.

Dunlevy, a book-keeper, testified that he was employed, about July 1, 1865, to adjust the books of Moss, Bradley & Co.   He worked on the books of all the firms, except firm No. 1, and was engaged in adjusting the books three and a half months.   In answer to the ninth interrogatory, he testified:   "Mr. Bradley gave me instructions about computing interest on individual accounts,—or, rather, he said he wanted it done in the same way it had been done in the previous firm, and he handed me or called my attention to the sheets on which the interest had been computed by Aylward, and the rate to be ten per cent, from the date of the entry in each account to the closing up of the firm.   I looked through those sheets, and saw that they were computed in that way.   He at the same time said that he thought the accounts of firm No. 2 and 3 had been computed, which proved not to be the case.   If any were done, I am not quite certain that there were not two or three of the accounts done."   The witness also testified:   "John Jack computed the interest on the personal accounts, at Bradley's house, when he was there with me, of the members of firm No. 2 and 3.   These computations were made on sheets of bill paper, the items and dates taken from the ledger as they appeared there, and the interest computed on each item, from the time of the date of the same up to the 27th of May, 1862.   Jack computed the interest of personal accounts of James H. McCall in firm No. 2, Bradley's account in firm No. 2 and 3, W. S. Moss' account in firm No. 2 and 3, and Perry Frazer's account in firm No. 2 and 3; also, the interest on the firm accounts of

Nos. 1, 4 and 5. In making up all these ·interest accounts, on all the books, the interest was computed on all the debits and credits; one was then subtracted from the other, and the balances, only, were posted in the ledger, to the debit or credit side, as the case required. I know it was done in that way. I examined Jack's footings of the interest account, and believe they were correct. I also believe his computations were correct."

Dunne, a book-keeper of Moss, Bradley & Co. from 1855, testified that "Aylward was engaged posting up the books, which were behind, and making computations on partnership accounts, interest on all accounts in which partners had an individual interest, and carried the same into their individual accounts. He computed interest in favor of each partner on all money and property put in, and against him on all taken out, at ten per cent. He did it under my direction." He also testified that Bradley knew that they were computing interest on the accounts, and he supposed that he assented. He left the matter in his hands. He also testified that he thought it was understood between all the partners all the time, that an interest account should be kept.

Evidence was also introduced that Moss himself admitted that it was proper to charge interest when money had been drawn out by a member of the firm. The evidence of Henry Grove upon this point was to the following effect: That pending the suit, Moss came to his office with McCall and Frazer, and said, among other things, that the interest, as charged on the books of the company against the parties on sums they had drawn out of the firm, should not have been set back,— it was wrong to set it back, but he did not owe the complainants anything, as he had paid or accounted to Bradley for this interest, and could produce papers to show it; that McCall and Frazer then offered to release him from the claim if he would produce that evidence, to enable them to collect it of the Bradley estate.

The record contains other evidence tending to show that it was the understanding of the members of the firm that an interest account was to be kept between the firms, and between the different members of each firm, but it will not be necessary to refer to it in detail.

From the evidence, it seems plain that the original articles of co-partnership, upon the question of interest, were changed by the partners, and it was well understood and acted upon that when a member of the firm drew out money, interest was to be charged on the amount, and when money was advanced, interest was to be allowed on the advance. If such was not the case, it seems strange that Bradley, who had charge of the books, would consume months and years of patient labor with the book-keepers in his employ, figuring interest on the accounts of the partners, with the view of adjusting the books, and the rights of the partners, on that basis. The book-keepers were not only directed to compute the interest, but it was to be entered upon the books, and the accounts of the partners adjusted in that way. Bradley was a man of superior business capacity. He dictated and controlled the financial affairs of each of the firms of Moss, Bradley & Co.; he had the sole charge of the books, and it is absurd to suppose that interest would have been computed and entered upon the books by the book-keepers, under Bradley's direction, had not a contract existed between the members of the firm that an interest account should be kept.

In 1859, after firm No. 1 had closed its business, and while firm No. 2 and 3 was in existence, Aylward was engaged by Bradley to write up the books for a final balance. He was instructed to compute interest on every item paid in and on each amount drawn out, from the date of the transaction to the close of the firm. The computations of interest were made upon loose sheets of paper. After working more than a year on the books of firm No. 1, he finished the work, and a balance was struck between the amount of interest each

partner was to pay and what he was to receive, and the balances thus found were entered in the partners' accounts, in the books. A balance sheet was then made, showing a settlement of firm No. 1. After the books of firm No. 1 were balanced, Aylward commenced upon the books of firm No. 2 and 3, computing interest on the accounts of the partners in the same manner he did in regard to firm No. 1, but, having died before the work was completed, the books of firm No. 2 and 3 were not written up until the summer of 1865, when Bradley took the books of the various firms to his home in Peoria, and employed Dunlevy and Jack to finish the work which Aylward had commenced. They went on computing interest precisely as Aylward did, and completed the work in October, 1865, when the books of all the firms were posted up, and balance sheets struck. If interest was not to be charged on money drawn out by one partner, or credit given for interest on money advanced, why was interest computed, by the direction of the principal manager of the business of the firm, on the accounts of the partners, and why entered upon the books of the firm? The testimony in the record gives no explanation of this feature of the case. Indeed, these acts, in connection with the declarations of the individual members of the firm of Moss, Bradley & Co., as shown by the evidence, would seem to settle the question, beyond doubt, that the members of the firms were to be debited and credited with interest on money drawn out and put into the firm, as shown by the books as they were left by Dunlevy, after the work had been completed by him and Jack.

But it is said the interest computed and entered on the books was, by consent of the parties, set back, and new balance sheets made out, to which Moss assented, and subsequently settled with Bradley's administrator according to the books thus changed. It is true that Dunne, about December 1, 1865, took the books which had been balanced by Bradley, Jack and Dunlevy, and cancelled the interest in the

partners' accounts by making cross-entries. By this change in the books, Dunne set back interest in the books of firm No. 2 and 3, amounting, in the aggregate, to $133,281.31. By this arrangement Moss and Bradley gained largely, while McCall and Frazer sustained large losses. We do not think this setting back interest, so far as firm No. 2 and 3 is concerned, can have any bearing in the decision of the case, as it was not authorized. The members of firm No. 5 had built a warehouse on land belonging to Bradley, and a meeting was called, in the fall of 1865, to determine whether the firm should buy the land, or Bradley buy the warehouse. At this meeting, Bradley, Frazer, Jack, Francis and Raymond were present, and also book-keeper T. W. Dunne, who had returned to Peoria after the books had been written up and balanced by Dunlevy and Jack. If Dunne received any authority to set back interest, it was at this meeting. Bradley never testified in regard to this matter, but Frazer, Francis, Raymond and Jack all testify that nothing was said or done at the meeting in regard to setting back interest in firm No. 2 and 3. Dunne thinks he would not have set back the interest unless he was authorized, but he can recollect nothing whatever that was said on the subject. The evidence on this point preponderates so clearly against the act of Dunne in changing the books after they had been written up and balanced, that we can not attach any importance to it.

In the argument, much reliance seems to be placed on the fact that interest was not computed and entered on the books during the existence of the firm,—but we do not regard this as an important fact favoring the view of the defendants. Interest could not be computed and entered on the books until the firm ceased to do business, as the termination of the firm was the period to which the interest was to be computed. Firm No. 1 closed June 2, 1856. In 1859 Aylward commenced computing the interest, with a view to balance the books. He completed his work in 1860, when the entries

were made on the books. He then commenced on firm No. 2 and 3, and the work progressed until his death. This firm terminated May 26, 1862, and in 1865 the work on the books, which had been commenced by Aylward, was finished. McCall and Frazer had often urged Bradley to have the books, which were much behind, written up, but the matter was delayed from time to time. The books showed the amount of money drawn out and paid in by each member of the firm. If interest, under the partnership agreement, was to be computed on the various items contained in the account of each member of the firm, we do not understand that the books would show any computation or entry of interest until the books were written up and balanced, with a view to a final settlement of the affairs of the firm between the partners composing the firm. If we are correct in this, the fact that the books do not show that interest was charged and credited on the accounts during the existence of the firm, does not militate against the claim for interest as made in the bill.

It is also insisted that the decision of this court when the case was here before, presents a complete barrier to a reversal now upon the main question at issue. We do not intend to depart from the former decision, or any rule laid down to govern the decision of the case when the record was here before. It is, however, to be observed, that the case made by this record is very different from the one made by the record when the case was here before. There is double the amount of evidence in this record that was in the record when the case was here before, and not more than one-half the evidence heard on the trial upon which the first decree was rendered was in the former record, as no certificate of evidence was then filed for the purpose of preserving the evidence. As heretofore observed, the decree first rendered was reversed because the record showed a complicated state of accounts between partners, and the circuit court had not referred the cause to the master to state the account, as is the practice in

such cases. It was, however, as to computation of interest on the accounts of partners, there remarked: "The calculations, so far as we understand the testimony, seem to have been made by computing interest on the individual accounts from the date of the several charges up to the date of the closing of the business, independently of the question whether the amounts drawn out exceeded the just share of the profits to the respective dates, due the several partners. This, we think, was incorrect. The only reasonable construction that can be given to the agreement contended for, if any existed, is, that each partner should be charged with interest on his individual account over his just share of the profits, and be credited with moneys he advanced in excess of his indebtedness to the firm." What was said in the opinion was upon the understanding that the evidence, as it then appeared in the record, might authorize periodical rests during the existence of the partnership, and where there may be periodical rests, and the accounts are balanced at stated periods, of course it would then be proper, in adjusting the accounts, to charge each partner interest on the amount drawn out in excess of his profits, and likewise give him credit for moneys advanced to the firm in excess of his indebtedness. If the contract under which Moss, Bradley & Co. were engaged in business provided that partnership accounts should be settled at any fixed period, a settlement would be compelled at that date; or if the members of the firm had uniformly made settlements among themselves at the end of each year, or at any other definite annual or semi-annual period, a settlement of the accounts might be required at such period, and the rights of the partners adjusted as of such date. But here, as appears from the evidence now in the record, the business of each firm ran along without any rest or settlement of accounts among the different members of the firm, until the firm terminated; and as we understand the law, where the partnership articles contain no agreement for periodical rests, and there is no

usage or agreement for stated settlements of the accounts of partners, then the partnership accounts. can only be stated at the end of the firm, for the reason it can only then be ascertained whether there are profits to be divided or losses to be borne. Parsons on Partnership, 314, 537; Story on Partnership, sec. 349; Collyer on Partnership, page 318, sec. 224.

When the case was first before us, it was taken for granted, in the opinion, that stated rests were provided for by contract or usage of the members of the firm. Now it clearly appears, from the evidence, that no such agreement was ever made, and no such usage is claimed or pretended. No definite amount of capital was ever agreed upon by the members of the firm. As to firm No. 2 and 3, the four members were to furnish each an equal amount of capital. On whatever amount any member might advance to the firm, he was to receive ten per cent interest; and if he should draw out money, he should likewise pay ten per cent on the amount drawn out. Under an agreement of this kind, could it be determined what the profits of a member are at any time, or whether there are profits, without periodical settlements? It seems plain it can not be done. At the end of six months there might be profits, but at nine months there may be none. At the end of twelve months there may again be profits, and six months later losses may again occur. But there is no profit or loss in which the members can share, in a firm like the one in question, until the co-partnership ends and the accounts are balanced. If, therefore, a partner pays interest on money he draws out of the firm from time to time, he is not paying interest on his profits, because he has no profits until the partnership is closed, and the profits, if any, ascertained. We think, under the evidence, it was proper to compute interest on the amount drawn out by each member until the close of the firm, as it could not be known at any time before that there were any profits. Had the evidence shown

33—112 Ill.

an agreement for annual rests, when the books might be balanced, a different rule might prevail. Nor do we perceive anything unjust or unequal in requiring the partners to pay interest on money drawn out of the firm. Suppose each of the four partners had put in $10,000 with which to carry on the business of the firm, under an agreement that each one should furnish one-fourth of the capital, and the next day one of the partners should draw out $10,000, would it not be right to require him to pay interest on the money withdrawn? If Moss and Bradley drew out of the firm large amounts of money, and used it for their own private purposes, and the earnings and capital furnished by McCall and Frazer remained in the firm, and the business was transacted with that money, should not Moss and Bradley be charged with interest on the money drawn out, on final settlement? Large sums of money were drawn out by Moss and Bradley, and used by them in private speculations, and justice, as well as the contract of the parties, demands that they should be charged interest on the sums drawn out and used.

Moss, in his cross-bill, claimed to be entitled to recover $28,265.25, which amount, on a certain accounting, it was found, as claimed, he owed firm No. 5 for money, wherein his account was overdrawn; that Bradley assumed the payment of said sum for Moss, and had the same charged to him, and that Moss subsequently settled the amount with the administrator of Bradley's estate. The court, in its decree, directed the master to give Moss credit for the said sum of $28,265.25, and interest thereon, and charge the same to Lydia Bradley, as administratrix of the estate of T. S. Bradley, deceased; but on the final decree, while the court gave Moss credit, and charged the estate of Bradley with that amount, it was held, and so decreed, that the estate of Bradley should pay nothing, for the reason and upon the ground that complainants had, in the former decree, obtained judgment against the estate for a certain amount, which had been

acquiesced in by the administrator of the estate, and paid. We have given this branch of the case due consideration, and while the question presented is not free from doubt, we will briefly state the conclusions which we think the evidence warrants. First, we are satisfied that Bradley agreed with Moss to assume and pay this item of $28,265.25, and upon a settlement with the administratrix, Moss paid the amount to the estate of Bradley; but we do not think the evidence shows that the amount was ever charged upon the books to Bradley, or that he or his estate has ever paid the amount. The amount may have been charged to Bradley on the books of Bradley, Jack & Co., but we find no evidence to justify the conclusion that the amount was ever debited to Bradley in the books of firm No. 5. The estate of Bradley, therefore, holds this $28,265.25 in its hands entirely unaccounted for. Dunne, in his testimony on this point, said: "On exhibit of the five firms there was due from Moss $28,265.25. This was transferred to Bradley's account, by Bradley's direction, on the opening of the new books." The new books alluded to by the witness are the books of Bradley, Jack & Co. The fact that the amount may have been charged to Bradley on the books of Bradley, Jack & Co., was no benefit to firm No. 5 or firm No. 2 and 3. We think the court properly found that Moss was entitled to a credit for the said $28,265.25, but we do not think the estate of Bradley is released by the rendition and payment of the former decree, but the estate should be held responsible for this amount on the final adjustment of the accounts of the several parties in interest, under the cross-bill filed in the case by Moss.

One other question remains to be considered. It appears that a large quantity of highwines was sold to David Dows & Co., amounting in the aggregate to $40,195.37. The sale of these goods was entered upon the books of firm No. 2 and 3 as goods sold by firm No. 2 and 3. The entry on the books was made by the book-keeper, Dunne. Three years after this

entry was made on the books of firm No. 2 and 3, Dunlevy transferred the account to the books of firm No. 4. McCall was not a member of firm No. 4, and if this account belonged to firm No. 2 and 3, of which he was a member, the transfer took $10,000 out of his pocket, and gave it to other parties. No evidence was introduced on this question but the books, and the master refused to make any correction of entries in the books, holding that under the decree of reference he had no authority to make any corrections if the entries were erroneous. Appellants entered a motion to refer the cause back to the master, with authority to take proof and make corrections if mistakes had occurred, but the court overruled the motion. We think the court erred in denying appellants the right to prove the facts in regard to this account. If the account belonged to firm No. 2 and 3, and the fact could be established, the court should have directed the master to take the evidence. Whether this money belongs to the one or the other firm can certainly be clearly established by evidence, and as the decree will have to be reversed, the cause should be referred to the master in such a way as to permit all evidence to be taken having a bearing on the question.

The decision of the Appellate Court will be reversed, and the cause remanded for further proceedings in conformity to this opinion.

*Decree reversed.*

Dickey and Mulkey, JJ., dissenting.

Subsequently, upon an application for a rehearing, the following additional opinion was filed:

Per Curiam: The petition for rehearing in this case has been carefully considered, and the points and elaborate arguments of counsel for appellees fully examined, and all have received our earnest attention; and whilst a majority of the court do not in all respects agree with all the reasoning and deductions drawn from the evidence, in the original opinion,

yet as to the general conclusions arrived at we do agree, and are of opinion that a rehearing should not be granted.

As counsel for petitioner claims that some points have not been settled by the court, and that he does not fully understand the opinion upon some others, we will notice some of them ; but it must not be inferred from this that we have not observed and given attention to all he has pointed out.

*First*—As the decree rendered against Mrs. Bradley, in the Woodford circuit court, was several as to her, and has been fully executed, and no appeal or writ of error prosecuted therefrom by either party, it may be considered final as to her, (so far, at least, as appellants are concerned,) as to all matters directly involved in the original bill. But it must be distinctly understood that we give no opinion as to the rights of complainant in the cross-bill filed on behalf of the estate of Moss, as against Mrs. Bradley, in which Moss' representative, among other things, seeks relief on account of moneys claimed to have been paid by Moss to Bradley, and in consideration whereof the latter promised to pay or discharge certain indebtedness of Moss to firm No. 2 and 3.

*Second*—With regard to the item of $28,265.25, it seems Moss owed this sum to firm No. 2 and 3, and by an arrangement between him and Bradley in reference to their own private matters, not connected with their firm business, Bradley was, as Moss claims, to pay or assume this amount for him, to said firm No. 2 and 3. As a matter of law, Bradley and Moss had no right, as against the other partners, McCall and Frazer, and without their consent, to appropriate the money or accounts of the firm to their individual use. Nor had Bradley any right to credit Moss on the firm books with this sum, unless it was actually paid into the firm, or was in some way authorized or ratified by the other members of the firm. If it was charged to Bradley on the firm books of some firm in which all the members of firm No. 2 and 3 were members, or in which McCall and Frazer were both members,

by their consent, they would be bound thereby; or if McCall
and Frazer, in the decree that was rendered in their favor
and against Mrs. Bradley, in this case, whilst it was in the
Woodford circuit court, recovered their share of this claim,
then that would ratify the credit of it on the firm books, to
Moss, and would be a proper credit to him on his partnership
accounts with the firm. But if they never authorized the
credit, (and we find no evidence that they did,) and if they
have not ratified it in either of the above ways, or in some
other way binding upon them, then Moss is not entitled to
that credit on the firm books of firm No. 2 and 3. It may
be added, that in this matter of crediting Moss on the books
of firm No. 2 and 3, with this item, and charging the same
to Bradley, the latter was acting as the agent of Moss, and
it was also a part of his special duties to keep the books of
the firm, and see that proper entries were made, and with
which McCall and Frazer had nothing to do, and if a loss is
to be incurred either by Moss or appellants, by reason of the
negligence of Bradley, it seems to us more equitable that the
estate of Moss or Bradley should bear it, than that Frazer
and the estate of McCall should do so. If, however, it is true,
as we understand Moss to claim, that he actually paid Brad-
ley this amount in the settlement of their individual trans-
actions, and that Bradley, in consideration thereof, promised
Moss to pay or account to firm No. 2 and 3 for that amount,
and has failed to do so, and if neither Bradley, nor Mrs.
Bradley, as his legal representative, has paid or accounted
to Moss therefor, or been released or discharged therefrom,
and it has in no manner been settled between the estates of
Bradley and Moss, or his estate, then the remedy of his ex-
ecutor or administrator would seem to be against the estate
of Bradley, rather than appellants.

*Third*—There is much force in the objection made to
sending the Dows & Co. matter back to the master for fur-
ther proof. It is claimed that it is not embraced within the

scope of the bill. The bill is for an accounting and settlement of the partnership affairs, and we do not deem it necessary that each item of the accounts or claims that is to be passed upon by the court or master, should be specifically set forth in the pleadings. Counsel contend that the evidence regarding this transaction should not be heard or considered, because, as they claim, "it is averred in the most positive terms in the bill, that, except as to the interest, the accounts upon the books *are true and just.*" We have read the copy of the bill, as given in the abstract, very carefully, and are unable to find such an allegation. It is also objected that it ought not now to be referred back again to the master, because appellants were negligent in not making their proof concerning this claim when the case was being considered by the master before. We regard this point as entitled to great weight, but owing to the peculiar circumstances of this case, the large amount involved, and the difficulty of understanding it in all its complications, and in the multitude of items to be looked up and considered, it is not strange that the master or counsel should have overlooked this item. We are inclined to think it would perhaps be rather harsh and inequitable in this instance to enforce the rule invoked for appellees, and especially as the case will have to go before the master again; and we can not but think that a careful examination of the books of the various firms will establish, beyond a doubt, which of them received the amount from Dows & Co., and enable the court properly to adjust the equities between the parties, arising out of this transaction.

*Rehearing denied.*