Florence May Jackson, Executrix of Will of Howard B. Jackson, Deceased, (original plaintiff); Continental Illinois National Bank and Trust Company of Chicago, Administrator de bonis non with Will annexed of Estate of Howard B. Jackson, Deceased, (substituted plaintiff), Plaintiff-Appellee and Cross-Appellant, v. Lou B. Jackson, Executrix of Will of Arthur S. Jackson, Deceased, Defendant-Appellant and Cross-Appellee; Harris Trust and Savings Bank, Executor, and Vera L. O'Neill, Executrix of Will of Edward Earl O'Neill, Deceased; Alma H. Hymers, Executrix of Will of Edward Hymers, Deceased; Jane R. Jackson, Administratrix of Estate of Frank G. Jackson, Deceased, Co-Defendants and Cross-Appellees; James E. Cairns, Co-Defendant, Cross-Appellee, Separate Appellant and Cross-Appellant; Harris Trust and Savings Bank, Trustee under Will of Howard B. Jackson, Deceased, Co-Defendant.

Gen. No. 44,848.

33

Opinion filed March 13, 1951. Rehearing denied April 24, 1951. Released for publication April 24, 1951.

WINSTON, STRAWN, SHAW & BLACK, of Chicago, for defendant-appellant and cross-appellee; JOHN C. SLADE, FRANK B. GILMER, GEORGE E. CHRISTENSEN, and EDWARD J. WENDROW, all of Chicago, of counsel.

CHESTER ARTHUR LEGG, WILL ABBOTT KELLY, and ECKERT, PETERSON & LEEMING, all of Chicago, for co-defendant and cross-appellee; OWEN RALL, of Chicago, of counsel. VERNON R. LOUCKS, and JAMES D. PETERSON, both of Chicago, for plaintiff-appellee and cross-appellant; CHARLES O. LOUCKS, and JAMES L. HENRY, both of Chicago, of counsel.

CHAPMAN & CUTLER, of Chicago, for co-defendant; DAYTON OGDEN and RALPH F. HUCK, both of Chicago, of counsel.

MARTIN O. WEISBROD, of Chicago, for co-defendant, cross-appellee, separate appellant and cross-appellant.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

This case comes to us on appeals and cross-appeals from a decree entered February 23, 1949, in an accounting suit by the estate of Howard B. Jackson against his surviving partners in the firm of Jackson Bros. & Co., grain and stock brokers. The controversy

arose soon after the death of Howard B. Jackson on January 19, 1923, and suit was commenced December 30, 1927, by Florence May Jackson, as executrix of the will of Howard B. Jackson. Arthur S. Jackson, principal surviving partner and coexecutor under the will, did not of course join in this suit. For more than 23 years, this suit has wandered through our courts and has finally arrived here accompanied by a record of approximately 4,000 pages plus exhibits and about 800 pages of briefs. All in all, this controversy, originating 28 years ago and now in its 24th year of litigation, bids fair to make an unenviable record in this jurisdiction.

Florence May Jackson died June 5, 1946, and the Continental Illinois National Bank and Trust Company of Chicago, as administrator *de bonis non* with the will annexed of the estate of Howard B. Jackson, deceased, was substituted as plaintiff. We will at times refer to plaintiff as Florence May Jackson.

The principal issue is the extent of the surviving partner's duty to disclose information bearing on the value of deceased partner's interest and to account therefor. The controversy has finally centered on five accounts.

One of these is the Frank G. Jackson Capital Account, which plaintiff claims was merely in the name of Frank G. Jackson as nominee for Howard B. Jackson. The Special Commissioner recommended and the court found that this account belonged to Howard B. Jackson and a decree was entered against the estate of Frank G. Jackson, which had defaulted, and against the estate of Arthur S. Jackson, appellant and defendant cross-appellee, with respect thereto for $176,228.37 plus simple interest at 6% from January 19, 1923, making a total of $452,013.71.

The other accounts (sometimes referred to as the anonymous accounts) were shown on the books as trading or customers accounts as follows:

37

Account #735, which the Special Commissioner found to be a firm account and therefore that Howard's estate would be entitled to 25% and on which he recommended a decree for $49,727.13 together with interest at 5% per annum compounded annually from January 19, 1923, the total amounting to $177,095.96. The court sustained exceptions as to this and held defendants not liable.

Account #700, Grain, which the Special Commissioner found to be a firm account with a credit of $40,525.40, of which the estate of Howard B. Jackson was entitled to 25%, together with interest at 5% per annum compounded annually from January 19, 1923, the total amounting to $36,081.33. The court sustained exceptions as to this and held defendants not liable.

Account #728, which the Special Commissioner found to be a firm account and on which he recommended a decree for $22,129.56 together with interest at 5% per annum compounded annually from January 19, 1923, the total amounting to $78,811.22. The court sustained exceptions as to this and held defendants not liable.

R. J. McFadden account, which the Special Commissioner found to be in the name of a fictitious person and actually a firm account and on which he recommended a decree for $163,227.37 together with interest at 5% per annum from January 19, 1923, the total amounting to $368,621.85. Compound interest on this account was not recommended. The court sustained exceptions as to this and held defendants not liable.

For an understanding of this case, it is best to begin with a short history of the firm involved. Exhibits included in the record date back to 1913. Howard B. Jackson and his nephew, Arthur S. Jackson, were at that time equal partners in a general brokerage and commission business. The enterprise prospered. Commissions earned in 1913 were $86,471.66. In 1917, when

Howard Jackson became vice-president of the United States Grain Corporation, they rose to $308,729.95. In 1922, the year before Howard died, they totalled $1,273,023.02. The firm is at times referred to as having been the largest grain brokerage business in the world. Its customers numbered in the thousands and its books and records were correspondingly voluminous.

On July 1, 1917, the day Howard assumed his duties as vice-president of the United States Grain Corporation, he executed a written partnership agreement with Arthur S. Jackson, whereby it was agreed that the business would be continued in the name of Jackson Bros. & Co., with Howard and Arthur as the only partners, sharing profits equally. On the same day, Howard sent a letter to the firm in which he said that he desired his brother Frank Jackson, who was employed by the firm in a minor capacity, to receive his (Howard's) share of the profits while he was engaged in government service.

In June 1919, a new partnership agreement was entered into between Arthur S. Jackson, Howard B. Jackson, James E. Cairns and Edward O'Neill. Frank Jackson was not a party to this agreement. The agreement recited that Arthur S. Jackson and Howard B. Jackson had been conducting the business as a copartnership under the firm name of Jackson Bros. & Co. and provided that the partners should be entitled to net profits on the following basis: Howard B. Jackson 30%, Arthur S. Jackson 40%, James E. Cairns 20%, and Edward Earl O'Neill 10%.

On July 31, 1920, a new partnership agreement was executed with Arthur S. Jackson, Howard B. Jackson, Frank G. Jackson, James E. Cairns, Edward E. O'Neill and Edward Hymers as partners with the following percentages: Howard B. Jackson 25%, Arthur S. Jackson 38%, James E. Cairns 19%, Edward E.

O'Neill 10%, Frank G. Jackson 4%, and Edward Hymers 4%. This agreement contained a provision whereby in the event of the death of any partner, the value of his interest should be determined and paid to his estate after an accounting and statement of the capital and assets of the partnership had been made, and the surviving partners should thereby purchase the interest of the deceased partner so as to continue the business without interruption. Either Howard or Arthur Jackson could require the withdrawal of any of the other partners upon ten days' notice and by payment only of his proportionate share of the accrued profits of the firm. The agreement also provided that the furniture, fixtures, partnership name and good will belonged and should continue to belong exclusively to Howard and Arthur Jackson, each with an equal share, and upon the death of either Howard or Arthur were to pass to the survivor.

This was the agreement in effect at the time of Howard B. Jackson's death. His will, made approximately six months before his death, bequeathed his entire interest in the partnership name, good will, furniture and fixtures to Arthur S. Jackson; set forth the procedure to be followed in making a settlement of his interest in accordance with the partnership agreement; and stated "My said partners shall assume all the debts and liabilities of the partnership and may purchase my interest in said capital and assets. . . ." He devised and bequeathed all his property to the Harris Trust and Savings Bank as Trustee, with a provision that the income thereof should be paid to his wife if she survived him, for her life; after her death the income was to be paid to his brother Frank. Upon the death of both his wife and Frank, the trust was to terminate and the principal and accumulated income given to his nephew Arthur, and if he were dead, then to the lawful heirs of Arthur. The will named his wife and

Arthur as executors. Both were duly appointed and served as executors until the death of Arthur on September 28, 1933. Thereafter, the wife served as sole executrix until her death.

Following Howard's death on January 19, 1923, the surviving partners had an accountant, Hiram E. Decker, prepare a statement of the capital assets, debts and liabilities of the firm, determine the value of the decedent's interest, and establish a suspense account as provided by the partnership agreement. This statement was served on Howard's widow and executrix and thereafter there was paid to the estate the full amount shown in the accountant's statement as the value of Howard's share, $356,553.28, together with interest at the rate of 6% per annum. Not long after the death of Howard, his widow questioned certain accounts on the partnership books and asked for an accounting thereof. Many of these accounts appeared on the books merely under a number or the name of a dummy or fictitious person. Howard's widow felt that there was a question as to whether these anonymous accounts were not, in fact, accounts of operations by the partnership itself or by Howard Jackson. After the controversy arose various accountants were employed by her to examine the books of the partnership. The first of these, Arthur Young & Co., made two reports, one dated February 15, 1923, and the second June 1, 1923. In 1929 one Angus Steven was employed by Florence to make such an examination. His balance sheet for the firm is in evidence as Defendant Lou B. Jackson's Exhibit 2. This balance sheet was in accordance with the records of the firm. It showed the value of Howard B. Jackson's interest to be $356,053.28 and also showed that the value of Frank Jackson's share was $176,228.67.

Some time prior to this, negotiations had been instituted with a view to settling the claims advanced by

Florence Jackson, and in July 1925 the amount of $100,000 was agreed upon. Pursuant to appropriate orders of the Probate court, this amount was paid to the Harris Trust and Savings Bank as agent for the executrix. Mrs. Jackson executed a release, but on July 8, 1926, petitioned the Probate court for permission to return the $100,000 to the surviving partners. On May 23, 1928, the Probate court found that certain of the surviving partners were willing to accept the return of this money. Its return was effected, except for $4,000 said to have been contributed by Frank Jackson, which was left on deposit with the Harris Trust and Savings Bank.

Frank Jackson withdrew from the firm in 1925. Edward O'Neill died March 15, 1927. James E. Cairns withdrew September 30, 1927. Arthur Jackson and Edward Hymers joined with members of Boesel & Co. to form the firm known as Jackson Bros., Boesel & Co. Arthur Jackson died September 28, 1933, Hymers on November 19, 1933, and Frank Jackson on March 28, 1940.

In December 1933 following the deaths of Arthur Jackson and Edward Hymers, the western business of the firm was discontinued. William C. Jackson, a brother of Arthur Jackson, who had been in the successor firm, proceeded to liquidate the assets. The books of the firm were put in storage. In the same month Jackson Bros., Boesel & Co. sold its waste paper and certain old records, such as confirmations of trades, to the Pioneer Paper Co. The remaining records consisting mostly of books, were stored in an old residence at 216 Ashland avenue, Chicago, a building formerly owned by the father of Mrs. William C. Jackson. When this building was sold, the records were removed by William C. Jackson to his office in the Board of Trade Building, where they remained until destroyed in 1935. Records produced at the hearing of

this cause consisted of thirty large bound volumes and nineteen large loose leaf volumes, but they comprised only a part of the firm records. With the end of the firm of Jackson Bros., Boesel & Co., the history of this brokerage enterprise as a going business came to a close.

Meanwhile, the suit filed in 1927 by Florence Jackson had made little progress. Demurrers, amended pleadings, motions to dismiss, and suggestions of deaths as they occurred occupy many pages of the abstract. There were several changes of counsel on both sides between 1928 and 1933. In 1934, after demurrers to an amended and supplemental complaint were sustained, a second amended complaint was filed. Demurrers to that complaint were sustained and in 1936, a second amended and supplemental complaint was filed. This is the complaint upon which trial was had. On July 16, 1937, there was a general order of reference to Master in Chancery Benjamin S. Adamowski. On March 1, 1939, this order was set aside and the cause referred to Master in Chancery Gerald S. Gorman. September 27, 1940, plaintiff's second amended and supplemental complaint was taken as confessed against Jane R. Jackson, executrix of the estate of Frank G. Jackson, deceased. On February 19, 1941, Master Gorman's term expired and he was appointed Special Commissioner to hear the case and report his conclusions of law and fact. He made a report in which he recommended that defendants be required to account concerning some twelve customer accounts and six accounts in the name of Frank G. Jackson. Eight of the twelve customer accounts appeared under numbers or fictitious names. Objections were filed before the Chancellor, JUDGE ROBERT J. DUNNE. In a memorandum order dated July 13, 1945, the court overruled exceptions to the Special Commissioner's Report with respect to the partners and re-referred the

case to the Special Commissioner to complete the taking of proof and report his findings of fact and conclusions of law within six months. The suit was dismissed as to the nonpartner defendants, Thomas F. Howell, P. C. Boomer, and the estate of Arthur W. Cutten. The names of Cutten and Howell appear throughout the record and there are intimations that some of the accounts in question were owned by them.

The Special Commissioner's Report on his accounting was made April 20, 1948. It found for plaintiff on all five accounts heretofore listed. It recommended the dismissal of defendant Harris Trust and Savings Bank, as trustee under the will of Howard B. Jackson (although it remained a defendant as trustee under O'Neill's will) which defendant's interest we shall discuss later; and denied the claim of James E. Cairns, which will also be treated subsequently.

Objections and exceptions to the report of the Special Commissioner were made and heard, and on February 3, 1949, JUDGE LEONARD C. REID filed a memorandum order. The court held that the Frank G. Jackson Capital Account was Frank G. Jackson's in name only and that in reality the account belonged to Howard B. Jackson, who owned whatever assets were in that account. Exceptions of the defendant estate of Arthur S. Jackson to the finding of the Special Commissioner in this respect were overruled, but the court sustained the exceptions of James E. Cairns and of the estates of Edward E. O'Neill and Edward Hymers with regard to the liability for the Frank G. Jackson Capital Account. The court sustained all exceptions to the Special Commissioner's Report with reference to the various anonymous trading accounts. The final decree awarded judgment to plaintiff on the Frank G. Jackson Capital Account for principal of $176,228.37 plus 6% interest per annum from January 19, 1923, to date (not compounded as in the Special Commis-

sioner's report); the interest totaled $275,785.35, making the total liability $452,013.71. Costs were to be borne equally by plaintiff and defendant Lou B. Jackson, as executrix. All other claims were disallowed.

From this decree, defendant Lou B. Jackson as executrix of the estate of Arthur S. Jackson, appealed. Plaintiff likewise has taken a cross-appeal from the decree insofar as it denied her claims on the anonymous trading accounts and as to the denial of relief against all defendants other than the estates of Arthur S. Jackson and Frank G. Jackson. Defendant James E. Cairns also appears here as cross-appellant with a claim for participation in recovery against the estate of Arthur S. Jackson. Cairns is the only surviving partner of the firm of Jackson Bros. & Co. as it was constituted at the time of Howard Jackson's death.

It is best to consider first the principles of law which govern this case. Arthur Jackson, as the senior surviving partner, bore a fiduciary relationship toward the estate of Howard B. Jackson, a principle well settled in this jurisdiction. *Witkowsky v. Affeld,* 283 Ill. 557; *Galbraith v. Tracy,* 153 Ill. 54; *Nelson v. Hayner,* 66 Ill. 487; *Andrews v. Stinson,* 254 Ill. 111; and see 173 A. L. R. 436. His position as coexecutor of Howard's estate confirmed the responsibility which the law placed upon him. His duty to account to the estate of his deceased partner was not fulfilled by the accounting which was rendered. For, as the Special Commissioner pointed out, the duty of a fiduciary to account is not discharged by submitting books of account, no matter how voluminous; nor is it discharged by the voluntary submission of those books to numerous accountants' examinations, no matter how searching. The fiduciary's duty requires that he go further and disclose all the facts within and outside the records

45

which bear on the deceased partner's interest. *Wylie v. Bushnell,* 277 Ill. 484; *Lehman v. Rothbarth,* 159 Ill. 270; *In re Judith Gap Commercial Co.,* 291 Fed. 792; *Malden Trust Co. v. Brooks,* 276 Mass. 464; *In re Enger,* 225 Minn. 229; *Tennant v. Dunlop,* 97 Va. 234, 244. As was said in the latter case, also involving an accounting by a surviving partner: "It is not sufficient that he does not withhold or conceal such information, but it is incumbent on him to disclose voluntarily all within his possession or knowledge from which a sound judgment as to the value of the interest may be formed."

■ In the absence of such full disclosure, all presumptions are against the fiduciary, and all obscurities and doubts are to be taken adversely to him. *Nonnast v. Northern Trust Co.,* 374 Ill. 248; *Conant v. Lansden,* 341 Ill. App. 488; *Lehman v. Rothbarth,* 159 Ill. 270; Perry on Trusts, 7th Ed. at p. 1397; *Crimp v. First Union Trust & Savings Bank,* 352 Ill. 93, 103. This is a doctrine so wholesome and so well established in the law that it is above challenge. *Illinois Linen Co. v. Hough,* 91 Ill. 63; *Moyses v. Rosenbaum,* 98 Ill. App. 7; *Tucker v. Dr. P. Phillips Co.,* 139 F. 2d 601.

■ Defendants insist that the partnership agreement prescribed the method by which the value of Howard's interest was to be fixed at the time of his death; that this method was followed and should not be disturbed by the courts, citing authorities. The value was fixed pursuant to the audit made by Decker, who had been selected by the surviving partners. This audit was as correct as any audit would be which took the firm books at their face value. If we were to take the audit as conclusive, we would have to accept as a fact that Frank Jackson had an unquestioned claim to the amount in his name in the Frank G. Jackson Capital Account, although Frank never paid anything for it and as was later brought out, neither

46

Frank nor Howard treated it as Frank's property. The very use of the word "accounting" in the partnership agreement indicates that Howard contemplated something more than this as the method for determining his interest. He had a right to expect and his estate had a right to receive the full disclosure which a surviving partner must accord in an accounting to the estate of a deceased partner. *Witkowsky v. Affeld, supra; Bauchle v. Smylie,* 93 New York Sup. 709.

It is in this light that we must examine the evidence in this case. We will first consider the Frank G. Jackson Account.

 *Frank G. Jackson Capital Account.* The Special Commissioner found and the court sustained the finding and decree that this account, although in the name of Frank G. Jackson, was in reality Howard's account and that Howard's estate was entitled to the assets therein. Therefore, unless these findings are against the manifest weight of the evidence, they must be sustained. (*Schmalzer v. Jamnik,* 407 Ill. 236, and cases there cited.) We find on examination of the record that the evidence clearly supports the findings. On January 19, 1923, this account had a balance of $176,228.37 accumulated almost entirely during the period from July 1, 1917 to July 31, 1920. This was a period in which Howard served as vice-president of the United States Grain Corporation and we have heretofore referred to the letter which he gave the firm when he entered that service. That letter is short and we quote it in full: "I desire that my brother, Frank G. Jackson, receive my share of the profits of Jackson Bros. & Company, while I am engaged in the work of the Government. You are, therefore, authorized and requested to pay my share of the partnership profits to Frank G. Jackson so long as I am engaged in Government work, unless I shall sooner give you different instructions." It is to be noted that this

was not an instrument of actual gift or transfer to Frank. It was made at the same time as the new partnership agreement, which again stated Howard's interest as a partner in the firm, notwithstanding his assumption of duty with the United States Grain Corporation. No actual delivery was ever made to Frank. Book entries alone constitute the basis for the alleged gift. During the period in question there was transferred to the account a total in salaries of $45,000 which must have represented Howard's and not Frank's earnings, because Frank's salary was only a fraction of this amount. In addition, profits of approximately $217,539.73 were added. Against this account were drawn sums which were unquestionably for Howard's benefit. A very significant item is the sum of $35,450 used for the purchase of Liberty bonds. These same bonds, or most of them, were later listed as assets of Howard's estate. To this convincing evidence, defendants reply: "Nothing could be more natural than for a brother who has been receiving very substantial amounts of money and was expecting to receive more in the future, to alleviate possible distress or to accede to a request by his benefactor to return a relatively small portion of the money. Frank would have been most ungrateful if he had refused such a request (assuming one was made)." The answer bespeaks its own weakness.

Other significant items worth mentioning are the following: Frank was an employee of the firm, earning a small salary. Whether it was $50 or $100 a week, as it is argued, is of no consequence. Howard had previously used Frank's name to identify accounts into which Howard had put some of his own firm capital or undistributed profits. This was true even prior to 1917. In 1915 Howard put $5,000 of his own into the Frank G. Jackson Account and in 1916 he put $20,000 into it. Defendants argue that the accounts

48

which existed at that time were not the same as this capital account. We will not analyze what appears to us to be a somewhat irrelevant argument, that the precise account in question was not the account to which Howard had made previous capital contributions. Whether the same page of the ledger embraced such accounts is not in our opinion important. The fact remains that Howard transferred profits which he had made into an account in Frank's name, which thereafter, although in Frank's name, continued to be Howard's.

Howard's funeral expenses were defrayed out of the account in controversy. The firm subsequently made a claim against the estate for these expenses which was paid and the amount credited to this account. As to each of these points an explanation is offered which did not satisfy either the Special Commissioner or the court. The cumulative effect of the whole array of circumstances is conclusive. It would be a curious coincidence, indeed, if this account, made up originally out of Howard's salaries and profits in his lifetime, used to buy securities for him, to pay certain of his expenses in his lifetime, and in the end to defray his funeral expenses, were not in reality Howard's, but Frank's. The Special Commissioner and the court could well have concluded that the payment of Howard's funeral expenses out of this account shortly after his death was more convincing as to the true situation than the later considered action of claim and reimbursement.

Defendants point out that on July 6, 1925, the then firm of Jackson Bros. & Co. charged that account with two checks, one for $50,000 and one for $150,000, or a total of $200,000, and on the same day made a credit to the Frank G. Jackson personal account of $185,000 and also a credit from the stock account of $7516.35. The cancelled checks were not produced in evidence,

and in the light of the practices of this firm with respect to book entries, this evidence is by no means persuasive. It is still not known who actually received the money from this account.

How both Arthur and Howard used the names of their wives and other relatives is shown in the case of *Jackson v. Jackson,* 300 Ill. App. 566, which involved a claim by Florence M. Jackson, the original plaintiff here, to an amount which was in her name on the partnership books but which Arthur successfully contended did not really belong to her.

We are of the opinion that the Special Commissioner and the court were warranted on the basis of very strong evidence, of which the foregoing is only partly illustrative, in concluding that the Frank G. Jackson Capital Account was really Howard's account and that Howard's estate was entitled to any assets therein. But it was not for plaintiff to remove any doubt. Whatever defense existed was based on information in Arthur's possession, information he should have disclosed in accordance with the principles applicable thereto, as we have earlier stated them.

Defendants urge that by having profits and salaries put in Frank's name, Howard either intended to make a gift of the money to Frank, or if he did so without actually intending to give the money to Frank, then Howard would have been guilty of income tax evasion, and being *in pari delicto,* his estate cannot now be heard to contest ownership of the account. Counsel have thus spent great labor on such matters as tax rates during the years of World War I and tax payments. In our opinion, much of the discussion is beside the point. Whether or not Howard was actually guilty of a wrong with respect to payment of income taxes would be difficult to determine. In any case, plaintiff properly points out that defendants cannot raise the issue of *in pari delicto* unless plaintiff relies

on the *delictum* as part of her case. This is not so here. *Cohn v. Pitzele,* 117 Ill. App. 342; *In re Meyerfeld,* 46 F. (2d) 665.

Defendants also argue that Howard's estate is equitably estopped from contesting the ownership of moneys put in Frank's name on the ground that, by causing such transfer to be made, Howard made a continuing representation to Arthur upon which Arthur relied, to his detriment. In the light of Howard's and Arthur's practice of placing their assets in the names of their wives and other relatives, we do not believe that Arthur was deceived or that there was any misrepresentation involved in Howard's action. It is also difficult to see how reliance on any such misrepresentation to Arthur's detriment can be made out of the evidence in this case, when the question of accounting arose on Howard's death and it was then that a disclosure of the true facts which Arthur was able to make would have saved the funds for proper disposition. *Wollenberger v. Hoover,* 346 Ill. 511; *Malloy v. City of Chicago,* 369 Ill. 97; *Lowenberg v. Booth,* 330 Ill. 548.

Defendants argue that since the second amended and supplemental complaint, on which trial of this cause was had, did not refer specifically to the Frank G. Jackson Capital Account in its claim for relief, no recovery can be had on this account. However, the prayer for relief in the complaint called for a general accounting and was adequate to embrace the account in question. In this type of proceeding, reference to specific items is not called for, if only because one of the objects of an accounting suit is to discover what is in fact the true situation with regard to various interests in the firm's assets. *McCall v. Moss,* 112 Ill. 493; *Penn v. Fogler,* 182 Ill. 76, 107.

The liability of the surviving partners other than Arthur Jackson will be discussed subsequently.

51

At this point, however, it should be noted that Arthur had special responsibilities with regard to the Frank G. Jackson Capital Account, responsibilities which distinguished his position from that of the other surviving partners. Arthur Jackson had been appointed coexecutor under Howard Jackson's will, had qualified and accepted the duties of that office and thereby assumed another fiduciary position for the benefit of the estate—to collect all assets in which the estate had an interest. This, coupled with the fact that for at least five years before the admission of the other partners there had been accounts on the books in the name of Frank Jackson which were in reality Howard's, indicates how the rules concerning fiduciary duties here applied to Arthur with special emphasis.

Defendants say that the amount of the liability on the Frank G. Jackson Capital Account is not quite correctly stated. This was not pointed out either to the Special Commissioner or to the trial court and is not properly made here. We have considered other arguments made by defendants with regard to this account and have found them without merit.

We turn now to consideration of the four trading acounts; that is, those accounts shown on the books as customers' accounts in each of which there was a credit in favor of whoever owned the account. These are Accounts #735, 700, 728 and the McFadden account. The Special Commissioner found defendants liable and recommended that they be ordered to account to the estate of Howard B. Jackson for 25% of the net credits as if the accounts belonged to the firm. The Chancellor sustained exceptions to these findings of the Special Commissioner and found for defendants. The reasons for the Chancellor's findings as set forth in the memorandum order filed by him were that all transactions in question occurred during Howard's lifetime when he was an active participant in the business and records and accounts were

open for his examination and inspection; that the use of a fictitious name or number was common in the brokerage business and no sinister implication could arise from that fact; that the partnership was a brokerage firm and not a trader; that Arthur's speculations were not questioned, and that the only objection thereto would be the improper use of partnership funds; that the contract did not forbid partners trading; that Arthur did not use partnership funds or capital to trade; and that the major responsibility for delay in the prosecution of the litigation was with plaintiff. In all these findings, except the last relating to laches which we discuss later, we concur.

 The problem presented to us by these secret accounts as distinguished from that of the Frank G. Jackson Capital Account is that even holding, as we do, that the principle of disclosure applies, we still have before us the question as to whether we may infer that the firm owned the accounts and that therefore the estate of Howard B. Jackson is entitled to 25% of the net credits therein. No matter how strictly we may apply the rule, it cannot mean that a court may indulge its fancy and deduce from the failure to disclose, the existence of facts which in themselves are negatived by facts which are in evidence. As we conceive the rule, a court will take into account the facts known and revealed by the evidence and applying the principle, draw such inferences from the failure to disclose as have a pertinency to the known facts. Thus, if the issue were whether Arthur Jackson was the owner of these accounts and he denied that fact, we would apply the principle against him and hold that he was the owner. It is in the light of our interpretation of this principle that we will have to examine the facts relating to these trading accounts.

These accounts have certain general characteristics in common. They were treated as customers' accounts on the books; commissions were paid as if the firm

were dealing with them as brokers and not as traders; so far as we know, the firm did not take any losses or show any profits from these accounts; Arthur Jackson dominated the accounts; Cutten and Howell, fabulous traders in stocks and commodities in the 1920's, gave orders from time to time with respect to one or another of these accounts; and while the accounts were unmargined at times, margins seem to have been made up shortly by profits transferred from successful grain manipulations. It should also be borne in mind that these transactions occurred during the boom of the 1920's when there was no administrative regulation of stock exchanges or boards of trade and no rules except those imposed by the Board of Trade itself upon the conduct of its members.

It appears that certain securities in Account #735 were traced to Arthur and his wife; that as to Account #700, the report of the accountant Steven is to the effect that the stock account belonged to Howell, and receipts for delivery to Howell of a substantial portion of stocks and bonds were produced; as to the McFadden account, Cutten gave orders for transactions and from time to time securities of great value were deposited to margin the account; as to Account #728, disbursements were made in the names of Mrs. A. W. Cutten and Mrs. A. S. Jackson, although the initials A. S. J. (Arthur S. Jackson) appear on the endorsement underneath the name of Mrs. A. S. Jackson. Thus, the facts in evidence show that Arthur Jackson and some other person owned these accounts. In any event, it is clear that they were never during the lifetime of Howard Jackson treated or considered as firm trading accounts.

Counsel for plaintiff recognizes that the problem involved is how we may infer from nondisclosure that the firm was the owner of the accounts. He has evolved the theory that the net credits in these accounts should

be considered assets of the firm; that being assets of the firm, the burden of proof is upon defendant partners who received these assets to show what was done with them, and if they fail to do so, it will be presumed that the assets remained with the firm until the contrary is shown. Of course, if the accounts belonged to the firm, then the net credits in the accounts were assets. If, however, the accounts belonged to some one else, they were liabilities. Assuming that these were assets of the firm is to immediately beg the question and to reason therefrom. What facts are in evidence show that the accounts belonged to Arthur and/or a third person. The most that can be said is that Arthur Jackson traded through the firm without putting up margins for a time. The Chancellor found that such trading was not forbidden by the partnership contract and that partnership money or credit was not used to operate the accounts. Plaintiff contends that partnership credit was used in the sense that failure to margin was a use of partnership credit. In one sense, that is true. In answer to that, however, is the fact that Arthur was the owner of the largest interest in this wealthy firm and able to meet all his commitments. All customers of a brokerage house, except cash purchasers, use the firm credit. The firm is made secure by margins, to be sure. But at the time in question, there was no law requiring margins nor any prohibition against the right of partners to trade.

 Great reliance is placed by plaintiff upon the circumstances surrounding the D. A. Campbell Special Account. This account was questioned by the junior partner Cairns, and Arthur finally admitting that it was not Campbell's account, made distribution to Howard's estate of its share, instead of claiming the account for himself. From this circumstance we are asked to draw the conclusion that the other trading accounts also belonged to the firm. What the facts were

55

which impelled that distribution we do not know. There was a split of commissions with Campbell and the implication is that this was a split for the benefit of a third person, which was perhaps a violation of a rule of the Exchange. There are circumstances which distinguish this account from the others, but even if that were not so, we cannot, in view of the known facts, infer from this transaction that the firm owned all the anonymous accounts.

We will now consider the other questions in this case and take up, first, the question of the liability of the surviving partners other than Arthur Jackson. The Special Commissioner concluded that Cairns, Hymers, O'Neill and Frank Jackson, as surviving partners, were equally culpable with Arthur Jackson. The trial court sustained exceptions to the Commissioner's report on this point and held that the partners other than Arthur and Frank Jackson were not liable. The trial court spoke of them as ''limited partners.'' This called forth vigorous protest from plaintiff's counsel who argue at length that there is no such thing as a limited partnership in Illinois unless the partnership is organized as such in accordance with statutory requirements. It is clear that the Chancellor in using this phrase was referring to the subordinacy in fact of the other partners, and it is unnecessary to engage in a discussion of limited partnership in the statutory sense to see the soundness of the Chancellor's conclusion. In view of our finding, the question is now only relevant insofar as the Frank G. Jackson Capital Account is concerned.

It is true that all surviving partners are held to occupy the position of trustees with reference to the estate of a deceased partner, particularly when they are to purchase such interest after an accounting pursuant to the partnership agreement. But the rule is well settled that where there are plural trustees,

56

each trustee is liable only for his own conduct in dealing with the affairs of the trust. ''He is not responsible for the acts or defaults—the intentional or negligent breaches of trust of a cotrustee, in which he has not joined nor concurred, or which he has not aided or made possible by his own negligence.'' Pomeroy, Equity Jurisprudence, 5th ed., Sec. 1082. Although search fails to reveal Illinois authority directly in point, the rule is supported by considerable authority elsewhere and is embodied in Section 224 of the American Law Institute's Restatement of the Law of Trusts. *In re Graham's Estate*, 218 Pa. 344; *Purdy v. Lynch*, 145 N. Y. 462; *Hayes v. Hall*, 188 Mass. 510; *Herr v. United States Casualty Co.*, 347 Pa. 148.

■ The partnership agreement of July 31, 1920 defined the interests of the partners as follows: Arthur 38%, Howard 25%, Cairns 19%, O'Neill 10%, Hymers 4%, and Frank Jackson 4%. Plaintiff makes much of this fact, arguing that if the subordinate partners are to be excused from liability, then it is necessary to define the particular point between 19% and 25% at which a person defined in a partnership agreement as a partner is in fact a partner so as to be liable for partnership obligations. However, the nonliability of the subordinate partners here is not based on the extent of their interest as defined in the partnership agreement, but rather on strong evidence indicating that there was no wrongdoing on their part and that their participation in control of the business as partners was in fact nominal. The agreement itself is revealing on this point. The good will and fixtures of the firm belonged exclusively to Arthur and Howard, and upon the death of either was to go to the survivor. The agreement also provided that withdrawal of other partners could be required by either Howard or Arthur upon ten days' written notice and the payment of the withdrawing partner's share of accrued profits. The

trial court found that the duties of the subordinate partners when admitted into this profit-sharing arrangement were the same as when they were salaried employees of the firm. Howard and Arthur were the controlling figures of the enterprise, with Arthur in charge of matters pertaining to the books and accounts.

The importance of Arthur's position was not, as plaintiff suggests, such as to make the other partners limited partners for the purpose of liability; rather, the importance of his position meant that the duty to disclose vital information after Howard's death was peculiarly Arthur's. The Frank G. Jackson Capital Account was established at a time when only Howard and Arthur were partners in the business and under circumstances which in our opinion made the real character of that account within the peculiar knowledge of Arthur and Frank. Frank, as we have stated, was defaulted in this case. The duty was Arthur's to disclose the facts.

The Chancellor pointed out that the effect of allowing recovery here against these other partners might be such as to reward Arthur's heirs (who now stand as heirs under Howard's will) for their ancestor's wrongdoing. While we do not consider this controlling, nevertheless a court of equity should pause long before the prospect of such an incongruous result.

Finally plaintiff urges that the liability of the subordinate partners here was the subject of a holding in JUDGE DUNNE's memorandum order of July 13, 1945, in which he re-referred the case to the Special Commissioner to hear additional evidence. Plaintiff points to parts of that order in which JUDGE DUNNE speaks of the duty of full disclosure incumbent upon fiduciaries, such as the defendants in this case. It is said that this order was a final and appealable one, binding on *all* defendants in this suit. The same memorandum order, however, directed the Special

58

Commissioner to report additional evidence taken to the court "together with his conclusions of law and fact concerning any indebtedness of the defendants to the plaintiff." It is clear from a reading of this order that it was not intended to be and was not a final order.

 The defense of laches is strongly urged upon the court. We have already spoken of the unenviable record this case bids to set. But we cannot blind ourselves to the realities of a legal battle such as this. It was apparently difficult for plaintiff to procure and retain counsel. Indeed, even in a bar as large and competent as that in this county, it is not easy for an experienced person to find counsel willing and able to carry the burden of litigation of this kind. The obstacles placed in plaintiff's path by defendants were many. A reading of the record reveals the stubborn resistance offered to her attempt to procure real disclosure. Counsel for Arthur have described her as a bitter woman obsessed with hatred of Arthur and an unreasoning suspicion. Such wrath should have energized her and is not consistent with the idea of slothfulness in the prosecution of the suit. Finally, we must recognize that chancery procedure, while improved over past years, is not geared by tradition or practice to the prompt dispatch of litigation of this character and must share in the responsibility for many of the unreasonable delays. In *Chicago Medical School v. Wilson,* 341 Ill. 170, the court said: "A court of equity will apply the doctrine of laches in denial of relief only where, from all the circumstances, to grant the relief to which the complainant would otherwise be entitled will presumptively be inequitable and unjust because of the delay." And to the same effect see *Kaifer v. Kaifer,* 286 Ill. App. 433, 438.

 The Special Commissioner allowed interest at 5% compounded annually. The Chancellor allowed simple interest at 6%, that being the rate fixed by the

partnership contract. A court of equity has broad discretion in the matter of interest. *Groome v. Freyn Engineering Co.*, 374 Ill. 113; *People ex rel. Barrett v. Farmers State Bank of Irvington*, 371 Ill. 222; *Duncan v. Dazey*, 318 Ill. 500; *McKey v. McCoid*, 298 Ill. 566. "In equity . . . interest is allowed because of equitable considerations, and is given or withheld as under all the circumstances of the case seems equitable and just." *Golden v. Cervenka*, 278 Ill. 409, 433. The basis for awarding compound interest in cases involving trustees is to make the cestui whole and recompense her for lost profits on money withheld. We cannot say that to redress plaintiff's loss we should add interest compounded for twenty-seven years, a period, involving as it did, a war and a depression during which many men were fortunate to maintain their principal. We will not disturb the Chancellor's finding in this respect.

■ One of the partners, Cairns, appears here as cross-appellant with a claim for relief in the form of an accounting from the estate of Arthur Jackson. In view of our holding that plaintiff is entitled only to relief with respect to the Frank G. Jackson Capital Account, and inasmuch as the firm had no interest in that account, the claim of Cairns as cross-appellant is denied.

The Chancellor has found that no relief was requested against the Harris Trust and Savings Bank as trustee under the will of Howard B. Jackson. We find no dispute as to this and confirm the Chancellor's finding in this respect.

In the 800 pages of briefs filed in this case there are points which we have considered but have not discussed in this opinion. Opinions, like litigation, must end some time, although this one may belie that idea. The points we have not discussed may seem important to the advocate thereof, but let him remem-

ber that twenty-four years of litigation have not produced an objective and dispassionate mood for the presentation of the complex questions involved. Indeed, at times important matters have been submerged and almost concealed by pejorative phrases and personal excoriation. This was not helpful to the court. At times we had to extricate from forensic debris what seemed to us material points, legally and factually. The Special Commissioner made a careful report and found favorably to plaintiff on these five counts. The Chancellor reviewed these findings, sustaining certain exceptions thereto, and rendering an opinion which has been helpful to the court. Each side should now have a healthy respect for the legal position of the other. It is entertaining to consult Dickens' Bleak House for a dissertation on the evils of prolonged litigation, but that works for both sides and leaves the court where it started. We do not mean to ask for briefs barren of all literary zeal and pungency. What we suggest is that the condiment be used with discretion and not in doses that make the whole dish unpalatable. When, therefore, petitions for rehearing are filed, as no doubt they will be by both sides, they should be confined to a consideration of the questions of fact and law involved, unencumbered by ad hominem invective or irrelevant scorn. The eminent lawyers in this case surely recognize that the prime office of counsel is to inform and enlighten the court, and with this suggestion, we know they will comply.

The decree of the Circuit court of Cook county is affirmed.

*Decree affirmed.*

FRIEND and SCANLAN, JJ., concur.