The First National Bank of Chicago, as Trustee Under Paragraph Fifth of Last Will and Testament of Oswald Karl Gerhard von Lengerke, Deceased, Plaintiff-Appellee, v. Esther von Lengerke Piaget et al., Defendants. Appeal of Carl von Lengerke et al., Appellants.

Gen. No. 45,951.

Opinion filed March 23, 1954. Released for publication June 2, 1954.

Ross, Berchem, Schwantes & Menk, of Chicago, for appellants.

ROSENTHAL, KING & ROBIN, of Chicago, for plaintiff-appellee; DOUGLASS PILLINGER, of Chicago, of counsel.

BENJAMIN WHAM, of Chicago, and J. MALCOLM JOHNSON, of Miami, Florida, for Piaget-defendants; WHAM, WELCH, METZDORF & McKEE, all of Chicago, of counsel.

LORD, BISSELL & KADYK, of Chicago, for defendants-appellees; GRAYDON H. ELLIS, and JANICE M. RICHARDSON, both of Chicago, of counsel.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from a decree construing the last will and testament of Oswald Karl Gerhard von Lengerke, a bachelor, who died July 19, 1932. He was survived by three brothers, three sisters, and their issue. The principal question involved is whether Esther von Lengerke Piaget, only child of Ruben von Lengerke, a deceased nephew, should take the share of her father in the corpus of a trust created by the will. The chancellor found in her favor. Four of the nieces and nephews abide by the decree and have filed a brief in support of it, although their shares in the corpus of the trust would be greater if a contrary theory had been adopted by the chancellor. These parties are called "Family" defendants in the briefs and we will use that designation here. Two of the nieces, Dorothy von Lengerke Sloan and Mrs. Henry E. Carey, Jr., oppose the entry of the decree and have taken an appeal. These, together with their associated interests, will be called the "Sloan-Carey" defendants.

After making gifts of personal property and some relatively small specific legacies to friends and relatives, the testator by paragraph Fifth of the will disposed of the residue of his estate, approximately $750,000, by creating a trust, which we will refer to as

Trust No. 1. In it he provides for an annuity of $2,000 to each of five brothers and sisters. Provision is also made for annuities of $500 each to nieces and nephews, including Ruben. It is provided that this trust should terminate upon the death of a majority of the brothers and sisters named as annuitants, that is to say, when three out of the five had died. Paragraph Sixth provides that upon the termination of Trust No. 1, the trustee should set aside a portion of the corpus of that trust, sufficient to produce an income of $4,000 per year, in a second trust, which we will call Trust No. 2, half to be distributed to each of the two surviving brothers and/or sisters, and as each of them died, his or her share was to be paid over to those persons to whom the remainder of the estate, originally held in Trust No. 1, was directed to be distributed. The direction covering the distribution last referred to is to be found in paragraph Seventh. It provides that upon the termination of Trust No. 1, the corpus remaining shall be distributed in kind to such of the nephews and nieces named in paragraph Fifth as "may at such time survive, and to the issue of any who may have predeceased me . . . ."

The last of the three siblings whose deaths constituted a prerequisite to the termination of Trust No. 1 died March 26, 1951. Thereupon, the trust terminated. The testator's nephew Ruben, father of Esther Piaget, died May 4, 1949, in the interim between the testator's death and the termination of the trust. It is the contention of the "Sloan-Carey" defendants that as Ruben neither predeceased the testator nor survived the termination of Trust No. 1, his share goes to the surviving nieces and nephews. On the other hand, it is the contention of Esther Piaget and the "Family" defendants that it appears from the will as a whole that the testator intended that the issue of any deceased niece or nephew should take their parent's

share in the corpus of the trust, whether said niece or nephew had died before or after the testator's death. It is their argument that this is the only construction of paragraph Seventh which is consistent with the general design of the will and with its other provisions, particularly paragraph Eighth, a clause of final devolution, which we will later consider.

 We are confronted at the threshold of this case with the argument that the language of paragraph Seventh is so certain, there is nothing to construe. The matter does not appear to us to be thus simply disposed of. In this field of law, principle contends with principle, maxims and rules enter the lists, but over the field there is one clear call reminding us that the testator's intention, as gathered from the entire instrument, controls. *Peck v. Drennan,* 411 Ill. 31, 103 N.E.2d 63; *Vollmer v. McGowan,* 409 Ill. 306, 99 N.E.2d 337; *Cahill v. Michael,* 381 Ill. 395, 45 N.E.2d 657 (and cases there cited); *Appleton v. Rea,* 389 Ill. 222, 58 N.E.2d 854. To that end, we will consider the general design of the will and the language of paragraph Eighth which is inconsistent with the interpretation of paragraph Seventh urged by the "Sloan-Carey" defendants.

We summarize the testator's general design with respect to his estate, as follows:

To provide adequate annuities for his brothers and sisters;

To provide smaller annuities for nieces and nephews (including Ruben, the father of Esther) for the duration of Trust No. 1 and, upon their death, to give the annuities to their children (which would have included Esther) *rather than let them lapse;*

To keep the estate substantially intact until three of the five siblings provided for had died;

Thereafter, by means of a reduced trust, to provide incomes for the two surviving siblings;

To control the further devolution of his estate by providing for its division among nieces and nephews and, in the event of their death, among their issue; and

Only in the event of the death of all nieces and nephews *without issue surviving,* should the estate go to those who would be his legal heirs under the laws of Illinois.

The design of the will, stated in its broad but nevertheless clear outline, is to provide for brothers and sisters, nieces and nephews, and then for the children of nieces and nephews, such children to take their parent's share; statutory devolution to occur when and if nieces and nephews die without children them surviving.

■■ The language of paragraph Eighth is consistent with this design. As this is an important paragraph, we quote it in full:

"Should all my nieces and nephews for whom provision is made in this my Will, have died prior to the times herein set for the distribution of the principal or corpus of either trust hereby created, leaving no issue any of them surviving, then with respect to that part of my estate which, at the various time herein provided for distribution, shall remain undistributed, by reason of the non-survivorship of legatees, and/or their issue at such time, it is my wish and I hereby direct that my Trustee shall make such distribution thereof as may be in accordance with the law of descent at such time in force in the State of Illinois."

By this provision the testator contemplated events which are wholly inconsistent with the interpretation contended for by the "Sloan-Carey" defendants. No sensible meaning can be given to the words, *"leaving no issue any of them surviving,"* compatible with the contention of those defendants. Twice in that paragraph the testator has emphasized that statutory

213

descent is to be applied only in the event of nonsurvivorship of a deceased niece or nephew *and/or their issue* at the time for distribution.

It is in relationship to this design and to the language of paragraph Eighth that we must interpret the language of paragraph Seventh which the "Sloan-Carey" defendants say excludes the issue of any niece or nephew who died between the time of the testator's death and the termination of Trust No. 1, although so far as the testator knew, that might be one day or, as it turned out, seventeen years. No good reason can be assigned for discrimination against a class, the membership of which he could not foretell. Such an intention would be scarcely more than a whim, and the will reveals the spirit of a man who would not thus arbitrarily discriminate. His sensitivity to any discrimination among his relatives is emphasized by his repeated references to his brother Justus who was not included in Trust No. 1 because he was a man of large means. It is argued that the testator did discriminate among his nephews by not including Charles. A reason for this exclusion is suggested by an offer of evidence contained in the record but not admitted. The testator remembered Charles with some small personal gifts. We can only infer that he had some valid reason for not further providing for him. The testator's affections seemed ample enough to include sisters-in-law, brothers-in-law, and the husbands and wives of nieces and nephews. It is suggested by the "Sloan-Carey" defendants that he desired to have his memory commemorated in the minds of those in the family who knew him during his lifetime and that he had a repugnance against his property descending to those who did not know him. This is not a reasonable inference from the will, and the evidence does not support it. The testator knew his grandniece Esther, who was sixteen

214

years old at the time of his death, and he also knew his other grandnieces and grandnephews then living. There is nothing in the facts of this case which reveals that he would want to hurt those he knew in order to avoid the descent of property to grandnieces and grandnephews who might be born after his death. The language of paragraph Seventh should yield to the testator's intention, as revealed by the entire will. The law supports this position.

Two cases recently decided by the Supreme Court of Illinois, one relied upon by the "Sloan-Carey" defendants, and the other by their opponents, present the last word on the issue before us. *Stern v. Stern,* 410 Ill. 377, 102 N.E.2d 104, cited by Piaget and the "Family" defendants, bears the closest analogy to the instant case. There, the will provided, " . . . where I have made any gift or provision for my children, such terms shall be taken to include the descendants of any of *my children who die prior to my death* leaving descendants, such descendants to take their parent's share in equal shares, per stirpes." (Italics ours.) It will be noted that this contains no provision that the descendants of a child dying after the testator's death were to take the parent's share. To his son Carl the testator had bequeathed an option to purchase a farm. This was a valuable option and, as such, the Supreme Court held it to be the equivalent of a gift of property. The option was to be exercised within two years after the testator's death or within one year from the death of his wife. The testator died February 18, 1949 and the son Carl died March 11, 1949 without having exercised the option. The court held that although no provision was spelled out for the heirs of a child who died after the death of the testator, nevertheless the general design of the will in that case as in the instant case clearly showed that the testator intended that they should be

215

provided for in the same way as the heirs of a child who died before the testator. The following language from the opinion in that case is especially pertinent to the instant case (p. 387):

"Any other conclusion is untenable, for it is unreasonable to assume that the testator, after deliberately and expressly protecting the interests and rights of the descendants of his children in case any of the children predeceased him, would intentionally deny the descendants those rights under the contingency where one of his children died just after the death of the testator but without having an opportunity to exercise the rights granted to him. Undoubtedly, the testator believed that the heirs were protected under the will under this contingency."

Evidence of circumstances under which the will was made was admitted in that case, as here.

The "Sloan-Carey" defendants cite the case of *Vollmer v. McGowan*, 409 Ill. 306, 99 N.E.2d 337, where the paragraph under construction provided that if any child should die prior to the testator's death, the surviving children should become seized equally of the property specified. There, the court examined the entire will and cited other articles explicitly providing for the same contingency in the same manner. It concluded that from the entire will and the design thereof, the testator intended that the surviving brothers and sisters of a deceased child (and not the child's issue) should inherit his share. In the instant case the contrary is true.

██ ██ We have not undertaken to distinguish the other cases cited by the "Sloan-Carey" defendants. We have examined them and do not think they support their position. Comfort can always be found in the general language used by courts in the multitude of opinions written in will cases. Cases involving the con-

216

struction of wills do not have the controlling force of precedent as in other cases. *Cahill v. Michael,* 381 Ill. 395, 45 N.E.2d 657; *Sloan v. Beatty,* 1 Ill.2d 581, 590, 116 N.E.2d 375. It is recognized that wills are found in a great variety of forms and are executed under circumstances peculiar to each individual case. *Walker v. Walker,* 283 Ill. 11, 118 N. E. 1014; *Smith v. Garber,* 286 Ill. 67, 121 N. E. 173.

■ ■ Parol evidence was introduced, seeking to give the court a picture of the testator and his family and of the circumstances under which the will in question was made. This was done over the objection of the "Sloan-Carey" defendants on the ground that there was no ambiguity and consequently parol evidence was not proper. It is apparent from what we have already said that we approve the chancellor's finding. Counsel, however, make the further argument that as the chancellor found that a proper construction could be had from the terms of the will itself, there was no need to hear parol evidence. This does not follow. There was a conflict which had to be resolved by the chancellor, and oral evidence could fortify or perhaps change the conclusion which he had reached on the basis of his examination of the will. An examination of the oral evidence, which is not extensive and is embraced in ten pages of the abstract, gives us a valuable picture of the testator and of the circumstances under which the will was made. We give a brief summary of it.

The oldest brother Justus came to this country about 1860 and then brought over his brothers and sisters. He established a sporting goods business in which his brothers worked and later, Oswald, the testator, founded the Chicago sporting goods firm of von Lengerke & Antoine. When Justus prospered, he bought a place at Stag Lake, New Jersey, where the family would gather. Oswald often visited there. He knew the

217

children of his nieces and nephews, including Esther. He would take them hunting and fishing and showed no preference for one over the other. He had an affection for all of them. He prospered, as his brother had, and throughout his life maintained a close family relationship with his kin.

It is difficult to conceive of any contest involving a will in which such evidence would not be proper. Counsel devote a considerable portion of their brief to denouncing the admission of this evidence and to complaints about the chancellor's conduct of the case. Making all due allowances for commendable zeal, this was misplaced energy. Where a case is being tried by a chancellor or by a common-law judge without a jury, it is better to admit evidence, even if doubtful, and thus avoid the necessity of a new trial in the event a refusal to admit is found to be error. Therefore, if the chancellor had some doubt about the admission of the evidence, or if it were inconsistent with the position he took, and we do not so consider it, he pursued the right course. Even assuming that error had been committed, this is the court where such error can be corrected, and there is no occasion for counsel to devote a substantial portion of their brief to the manner in which the alleged erroneous conclusion was reached. A reviewing court is thrown into the midst of a problem, whether complicated or simple, with abrupt immersion. Counsel, in the preparation of their briefs, should bear this in mind and make it their first duty to clarify the issues and their position with respect to them. A psychological assault of upper-case artillery and a barrage of emphases serve only to distract and becloud. We refer counsel to what we said in the case of *Jackson v. Jackson,* 343 Ill. App. 31, 61, 98 N.E.2d 169, and to the case of *McFerson v. Argyle Sav. Bank,* 199 Iowa 624, 200 N. W. 233.

 We turn now to the question raised as to the interpretation of paragraph Sixth, creating Trust No. 2. That paragraph provides that upon the termination of the trust created by paragraph Fifth, the Trustee shall set aside a sum which, invested at 5%, would be sufficient to produce an income of $4,000 annually, and this income was to be divided in two equal shares for the benefit of the surviving siblings. As each of the siblings died, half of the fund theretofore held for his or her benefit was to be paid over to the same persons to whom the remainder of the whole estate originally held under Trust No. 1 was to be distributed. The decree provides that the trustee should set aside $110,000 for the corpus of Trust No. 2. Of this, no complaint is made. However, the decree further provides that upon the termination of that trust, the distribution thereof should be made to the testator's nieces and nephews who survived the termination and to the issue then living, *per stirpes*, of those who died prior to the termination of the trust. The "Sloan-Carey" defendants object to this disposition of the corpus. It is their contention that under paragraph Sixth, vested remainders are created in the corpus of the trust and that the decree converts them into contingent remainders. They distinguish this from the interpretation of the language relating to Trust No. 1 and say that it is a distinction advisedly made by the testator. To put it another way, it is their position that the distribution of the corpus of Trust No. 1 is contingent upon the distributees' surviving the termination of the trust, but as for Trust No. 2, the estates are vested, the distributees are ascertained, and only the enjoyment of the estate is deferred. We find such an interpretation inconsistent with the language of paragraph Eighth and the general design of the will. Applying the same principles of construction heretofore applied, we are of the

219

opinion that the conclusion of the chancellor is correct with respect to this portion of the decree.

The "Sloan-Carey" defendants complain of that portion of the decree which apportions the accumulated income in Trust No. 1, amounting to $25,000, in the hands of the trustee at the time of the death of Ida von Lengerke Beust. They urge that this be treated as intestate property. The decree distributes this accumulated income as follows:

- 4/19 to Carl von Lengerke, a brother,
- 4/19 to the estate of Ida von Lengerke Beust, a sister, who died March 26, 1951,
- 4/19 to the estate of Marie von Lengerke, a sister, who died June 17, 1951,
- 1/19 to Mrs. Henry E. Carey, Jr., a niece,
- 1/19 to Dorothy von Lengerke Sloan, a niece,
- 1/19 to Ernst von Lengerke, a nephew,
- 1/19 to Camilla von Lengerke Bandekow, a niece,
- 1/19 to Ida von Lengerke Fleming, a niece,
- 1/19 to Justus von Lengerke, Jr., a nephew,
- 1/19 to Grace von Lengerke, widow of Ruben, a nephew.

This was obviously done on the basis of preserving the relationship of the annuity of $2,000 to each brother and sister and $500 to each nephew and niece. The "Sloan-Carey" defendants advise the court in their brief that lest we feel they give undue importance to this relatively small item, it means a great deal to a needy brother, defendant-appellant Carl von Lengerke. In their reply, the "Family" defendants point out that Carl von Lengerke would, if the income were held to be intestate, participate in the accumulated income only as one of the testator's heirs at the time of the testator's death, so that under their interpretation, he would receive only 1/7 of $25,000, or $3,571. Under the decree as it stands, he would receive 4/19 of $25,000, or

$5,260, that is to say, that this brother would lose approximately $1,700. The "Family" defendants say that as a group, the "Sloan-Carey" defendants would receive more in toto under the decree than by treatment of the accumulated income as intestate property. This appears to be correct.

 In their decisions on this question, courts have made a distinction between what constitutes income and what constitutes an annuity. If it be strictly an annuity, it is not apportionable. If it is income, then it is. The distinction generally between an annuity (using that term in its formal sense) and an income is that an annuity is a fixed sum, payable periodically, subject to such limitations as the grantor may impose. *Routt v. Newman,* 253 Ill. 185, 97 N. E. 208. In the instant case, under subparagraph D of paragraph Fifth, the will provides a formula for the manner of payment in the event of a deficiency and for distribution of any surplus. The size of the estate was such as to add a substantial surplus annually to the amounts provided for the annuitants. Other conditions are set forth in the same paragraph, whereby under other contingencies the amounts provided for would be increased. Therefore, while the testator called the payments "annuities" and while we have so referred to them in this opinion, they are not strictly such. In *Kemble's Estate,* 28 Pa. Co. Ct., 380, the court said:

"The principle which denies apportionability in the case of annuities has nothing to do with the question of apportionability of annual sums given by the bounty of the testator, even though he may in his will, erroneously speak of them as 'annuities,' which they are not.

"An annuity, in its technical sense, is 'a yearly sum stipulated to be paid to another, in fee, for life, or for years, and chargeable upon the person of the grantor':

3 Kent, 460; Co. Litt. 144 b. It is created by deed, and its non-apportionability is purely the result of the doctrine of the entirety of contracts, a doctrine which, of course, has no application to the interpretation of wills.

"The doctrine, in any case, is so opposed to modern ideas of justice and right, that in England, by a series of legislative enactments . . . it has been completely abolished and eradicated."

 When we consider the general design and the express provisions of this will, it is clear that to treat this property as intestate property would be farthest from the intention of the testator. We consider it a much more reasonable approximation of the testator's intention to apportion the income. While it is true that the trust terminated upon the death of Ida von Lengerke Beust, we believe that enough life was preserved to permit a fair apportionment of the income which had accumulated prior thereto. The question is not to find terms to describe what is done, but that the intention of the testator be fulfilled as well as we can determine it. The chancellor in making this apportionment included the estates of Ida von Lengerke Beust and Marie von Lengerke. Four out of six of the nieces and nephews have accepted that apportionment and it has the approval of a leading authority.

Scott on Trusts, Vol. 2, Sec. 238.1, p. 1331, supports the method applied by the decree. He does so on the basis of what we think to be a very sound common-sense argument, which we quote as follows:

"Whatever may be the rule as to annuities created by contract, there is no good reason why an annuity payable out of a trust estate should not be apportioned. Surely it would be more in accordance with the purpose of the settlor in creating the trust to permit apportionment where the annuitant dies in the interval between the payment dates. The annuitant will natur-

ally incur expenses from day to day in reliance upon his expectation of receiving the annual payment which he will receive if he lives. If he should happen to die just before a payment is due, his estate might well be unable to pay the debts which he has naturally incurred. It would surely be more in accordance with the intention of the settlor that he should receive income at the specified rate up to the time of his death.

"In many states today there are statutes which provide that if a person entitled to an annuity dies between the dates of payment the annuity shall be apportioned unless it is otherwise provided by the instrument under which the annuity is created."

The cases of *Glaser v. Chicago Title & Trust Co.*, 393 Ill. 447, 66 N.E.2d 410, and *Routt v. Newman*, 253 Ill. 185, 97 N. E. 208, cited by the "Sloan-Carey" defendants, involved the disposition of income received by a trustee after the death of an income beneficiary. In neither case had the trust terminated and the apportionment problem did not concern income which had accumulated at the time of the death of the income beneficiary, as in the instant case. The other two cases cited by the "Sloan-Carey" defendants have no application to the problem before us. The question in *First National Bank v. Cleveland Trust Co.*, 308 Ill. App. 639, 32 N.E.2d 964, was whether income deficiencies could be made up from defaulted interest on bonds which was paid to the trustee subsequent to the death of the income beneficiary. The interest income was received by the trustee after the death of the beneficiary; it was not in the hands of the trustee at the time of the beneficiary's death. In *Equitable Trust Co. v. Jennings,* 189 Ill. App. 359, it was clear the testator intended that the payments should be treated as annuities, and the language of the will expressly precluded the apportionment of the annuities upon the death of any of the

223

beneficiaries. In the instant case, the testator did not expressly provide for a method of distributing the income on hand at the termination of the trust different from apportionment. If he had intended that the payments should not be apportioned, then it is likely that he would have made an express prohibition against apportionment, as in the *Jennings* case.

█ Counsel argue that the testator had an intricate plan which was embodied in his will by able lawyers and should therefore be followed to the letter. The law books of every state are filled with cases in which able counsel have been met by equally able counsel who have disagreed over the meaning of a will drawn by other able counsel. Legends abound concerning eminent lawyers who have failed to draw their own wills unambiguously. The rule requiring a court to consider the language of the entire will and the general design thereof, rather than particular words, is specially apt in the construction of a long and complicated will. The chancellor followed this rule, and we are of the opinion that he reached the correct conclusions.

*Decree affirmed.*

ROBSON and TUOHY, JJ., concur.