**C. N. Johnson Realty Corporation, Plaintiff-Appellee, v. Mansfield Building Corporation, Defendant-Appellant. Samuel D. Rowe et al., Trustees Under Last Will and Testament of Lucy J. Rowe, Defendants-Appellees.**

Gen. No. 46,414.

First District, Second Division.

March 8, 1955.

Released for publication April 20, 1955.

Rosenthal, King & Robin, of Chicago, for appellants; Willard L. King, Sidney L. Robin, and Frederick W. Temple, all of Chicago, of counsel.

Johnson & Wiles, of Chicago, for appellee; Walter E. Wiles, and Pierro C. Johnson, both of Chicago, of counsel; Winston, Strawn, Black & Towner, of Chicago, for defendants-appellees; Calvin Sawyier, and Frank D. Kenney, both of Chicago, of counsel.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

In this case the trial court in a declaratory judgment proceeding construed the provisions of a sublease from plaintiff to defendant Mansfield Building Corporation, leasing property at the northeast corner of State and

Adams streets, Chicago. The court adopted the construction contended for by plaintiff, found against Mansfield, and entered an order requiring it to pay to plaintiff $8,889.27 plus costs of litigation including attorneys' fees, as provided by the lease. From this decree Mansfield has taken an appeal.

The defendant trustees of the estate of Rowe, ground lessors, own the fee and in 1944 leased the property for a term of approximately 99 years to DeMet's 143 S. State St. Inc. DeMet's assigned its interest to the 135 South State Street Corporation, whose name was later changed to C. N. Johnson Realty Corporation, the plaintiff. Plaintiff subleased the premises in question to Mansfield Building Corporation for a period from May 1, 1946 to July 31, 1993.

The only substantial issue is between plaintiff and Mansfield. It arises over the construction of a provision which allows Mansfield to deduct "excess taxes" (which we will later explain) from the rental to be paid. The same question arose between the ground lessors and the plaintiff and an agreement was reached between them by which plaintiff pays rental to the ground lessors on the same basis as it now seeks to have Mansfield account to it. The provisions of the ground lease are relevant to a construction of the sublease and for that reason the ground lessors have filed a brief in order, as they say, that the court may not by interpretation affect their interest. As our conclusions do not affect the ground lessors, we will not have occasion again to refer to their interest.

The ground lease provides that the lessee shall pay:

1. A fixed annual rental, payable in monthly installments,

2. All real estate taxes, and

3. A percentage rental, in addition to the fixed rental, of 4 per cent of the main floor retail sales in excess of $3,000,000 annually. We will call this "additional rental."

312

From this additional rental lessee is entitled to deduct "excess taxes." As this is the hub of the controversy, we quote that portion of Article II of the ground lease which covers this provision:

". . . in the event that during any year in which such additional rental shall be paid the general taxes which shall have accrued for such fiscal year shall be greater than the general taxes for the year 1944, the excess of such general taxes shall be deducted from and serve as a credit to the Lessee as against such additional rental for such respective fiscal year."

For the purpose of computation of the additional rental, the lease fixes a fiscal year commencing August 1st and ending July 31st of the following year. At the end of each fiscal year, the lessee is required to furnish lessor with an accounting statement within 60 days showing the excess of main floor sales above $3,000,000 for the preceding fiscal year and is required to pay the additional rental thereby shown within 90 days after expiration of the fiscal year. If there is an objection to this accounting statement it is required to be made within 60 days from receipt of the statement, and machinery is provided for arbitration.

The sublease, like the ground lease, provides for a fixed annual rental and for similar additional rental and has a similar plan for accounting, payment, objection and arbitration. The provision with respect to additional rental gives Mansfield an election of one of two methods. The method Mansfield elected requires it to pay the amount of additional rental which plaintiff is required to pay the ground lessors under the terms of the ground lease, plus certain additional sums representing the profit of plaintiff. Thus the provisions of the ground lease before mentioned determine the liability of Mansfield to plaintiff.

The nature of the issue is well stated in a memorandum filed by the trial court as follows:

313

"The controversy between the parties arises from the fact that the rentals reserved under both leases are determined on a fiscal year basis and, in addition, that the rental obligation is diminished by the amount that the general real estate taxes in any fiscal year exceed the actual general taxes for the calendar year 1944. The fiscal year ends on July 31st. Consequently, since the actual general taxes for a part of each fiscal year will not be known until tax bills are issued during the next calendar year, the lessees under both leases are required to estimate those taxes in advance for purposes of payment to their respective lessors. The question then arises whether, when the actual taxes are later known, an adjustment between lessor and lessee in each lease is required for the difference between the actual tax and the prior estimate."

On October 1, 1950, when Mansfield was required to file its accounting for the fiscal year from August 1, 1949, to July 31, 1950, the only tax bills available for computation of the deduction for excess taxes were those issued in April 1950 for the 1949 taxes. These bills furnished the basis for definite determination of the taxes for the five months of the fiscal year between August 1 and December 31, 1949, that is, 5/12ths of the taxes for 1949, but taxes from January 1 to July 31, 1950, seven months of the fiscal year, had to be estimated. No provision was made in the lease as to how such taxes should be estimated. Mansfield, it is not denied, made the estimate in good faith, but when the tax bills came the following April, it appeared that Mansfield had overestimated the amount of such deduction, but refused to make good the deficit, and the controversy now before us then developed. We, therefore, have to construe a lease which, on the one hand, provides for payment of a specifically determinable sum without qualification and, on the other hand, has a requirement of payment at a time when the amount

due could not be specifically determined but had to be estimated.

■ An examination of the lease and sublease convinces us that the parties intended that the deduction should be based on the actual amount of taxes required to be paid by Mansfield, and not on an estimate. The obligation to pay is definite and the deduction allowed is that of taxes "accrued." "Accrued" is a word used in the statute in fixing a lien for taxes and, in our opinion, cannot relate to anything other than the actual tax. No provision whatever is made for estimating taxes. The actual tax would be known about six months after the date for payment, and it is incredible that under such circumstances businessmen would knowingly have made an estimate controlling. The ground lease provides for the accrual of taxes by a provision that the lessee shall deposit monthly 1/12th of the prior year's tax bill in a fund for the payment of taxes and further provides that in the event the fund thus accrued exceeds the actual taxes, thus creating an excess, lessee is given credit for this excess against tax bills for the succeeding year. As Mansfield elected to be bound to the payment of rental based upon the ground lease, it could happen that if Mansfield's position were sustained, it would be given credit for the payment of too much additional rental and at the same time be relieved from the payment of any deficit. For these reasons, we conclude that it is the actual tax and not the estimate that determines the deduction.

In arriving at our conclusion, we have not dwelt on the meaning of the word "accrual" as it is used in the lease. It is a word of many meanings. "All words which are applicable to things, even in the particular context of the circumstances in which they are uttered, with the exception only of proper names and singular terms which purport to name one and only one object . . . always have many meanings." (Charles P.

315

Curtis' "A Better Theory of Legal Interpretation," pp. 135, 148, appearing in Jurisprudence in Action, Baker Voorhis & Co., Inc., Publishers, 1953.) The fact that Mansfield accrued the taxes in the sense that it estimated them in a manner which it thought correct does not make that an accrual within the meaning of the lease. The word "accrual" in our opinion meant taxes which on a pro rata basis had accumulated during the fiscal year and which in due time would be known and would have to be paid. We confess that "accumulated" is not precisely the right word, but we have been unable to find a better substitute to describe a situation which lawyers, real estate men and all who have to pay taxes on real estate readily understand. It serves to illustrate how the infinite variety of human affairs makes precise expression difficult. While a conflict arises in the assumption that the "excess taxes" would be known at the time of accounting and could then be paid, it is still clear that the parties contemplated a deduction based on actual taxes and that is the intention which should prevail.

Our conclusion is fortified by a letter written by the president of Mansfield, which we will now discuss. The first year in which this question arose, that is, the first year in which Mansfield took a deduction for taxes which subsequently proved to be larger than the actual tax would warrant, was in the fiscal year ending July 31, 1949. In that year defendant Mansfield and plaintiff had some discussion over some minor matters such as the dimensions of a sign. Apparently they made progress in the settlement of their dispute for on February 16, 1951, the president of Mansfield wrote to plaintiff, enclosing a memorandum of agreement which purported to be a settlement of their differences, including the matter now before us. He enclosed a check for $3,193.54 to cover the difference between the deduction taken by Mansfield and a deduction based on the actual tax for the fiscal year ending July 31, 1949. The

316

agreement was not signed, the differences were not adjusted, and in subsequent years Mansfield refused to make an adjustment on the basis of actual taxes. The enclosure of the check may have been on the assumption that there was an agreement, but there is no reservation in the letter and it is a fair inference that Mansfield was conceding plaintiff's interpretation of the lease and sublease. It therefore has value as a contemporaneous construction by the parties themselves and as an admission by Mansfield.

██ Mansfield argues that for the court to implement by decree what we find was the true agreement of the parties would be to reform the contract and that this is contrary to precedent and law. Many decisions of our courts have interpreted written instruments by giving them a meaning which, if literally expressed in the documents themselves, would have required the insertion of words and even paragraphs. In Stern v. Stern, 410 Ill. 377, 102 N.E.2d 104, a will provided that gifts for children should go to descendants of any of the children who died prior to the testator's death, but contained no provision that descendants of a child dying after the testator's death were to take the parent's share. The court supplied the needed language to accomplish the obvious intention of the testator, drawn from the entire will. In Continental Illinois Nat. Bank & Trust Co. of Chicago v. Art Institute of Chicago, 409 Ill. 481, 100 N.E.2d 625, a trust instrument was amended, but in the making of the amendment an omission occurred, on the basis of which a gift would have gone to one charitable institution instead of another. The court nevertheless so interpreted the instrument of amendment as to supply the omission. It was in a sense a reformation of the instrument. In First Nat. Bank of Chicago v. Piaget, 2 Ill.App.2d 207, 119 N.E.2d 457, an omission somewhat similar to that in Stern v. Stern, supra, occurred and was likewise construed. Many other cases could be used to demon-

strate that in its efforts to find a reasonable construction of a contract of this character, the court is not baffled by the fact that an interpretation is called a reformation.

Mansfield argues that it is common practice in cases of the sale of real estate to provide for the apportionment of taxes based upon the last year's taxes known at the time of sale. This is true, it being generally supposed that there will be no great variation in the tax, but the practice applies to one year only. Such practice has no value in the construction of a lease extending over a period of 99 years, as in the ground lease, and 47 years in the sublease.

 It is suggested by Mansfield, although not made one of the points in its brief, that under the terms of the lease, plaintiff should have filed its objection to the computation, as provided by the lease, and if no agreement was reached, the matter should have been submitted to arbitration under the provisions of the sublease. However, at that time the plaintiff could only oppose its guess to the defendants as to the amount of the actual tax. As heretofore stated, it was the intention of the parties that the actual tax should govern the amount of the deduction. That is not a matter for arbitration under the terms of the lease. The provision for arbitration relates to disagreements "with respect to the computation of main floor retail sales, as well as the allocation of main floor retail sales." The clause for the payment of rent provides for objection within 60 days "to the computation of such additional rental," and then provides that if the parties do not reach an agreement within 60 days after the landlord's objection "said matters shall be submitted to arbitration as hereinafter in Article 14 of this lease provided." It is our conclusion that this does not relate to taxes. It is hardly credible that it was intended to arbitrate the

amount of the tax deduction, when a short wait of five or six months would make the amount certain.

Decree affirmed.

McCORMICK, P. J. and ROBSON, J., concur.